MALLORY *vs.* WILLIS.

The plaintiffs agreed to deliver good merchantable wheat at a flouring mill carried on by the defendant, " to be manufactured into flour." The defendant agreed to deliver 196 pounds of superfine flour, packed in barrels to be furnished by the plaintiffs, for every four bushels and fifteen pounds of wheat. He was to be paid sixteen cents per barrel, and two cents extra in case the plaintiffs made one shilling net profit on each barrel of flour. The defendant was to guaranty the inspection. The plaintiffs were to have the " offals or feed," which the defendant was to store until sold. *Held,* that the contract imported a bailment of the wheat and not a sale, and therefore that the plaintiffs might maintain replevin for a portion of the flour manufactured from the wheat delivered under the contract.

[77] MALLORY & LEGG brought replevin against Charles P.

Willis and Christopher Willis for seventy-five barrels of flour. On the trial in the supreme court before Justice PRATT, an agreement between the plaintiffs and the defendant Christopher Willis, was read in evidence as follows :

" Article of agreement made and entered into the 19th day of August, 1845, between Smith L. Mallory and Caleb J. Legg, of the town of Benton, county of Yates, and state of New-York, of the one part, and Christopher Willis, of the town, county, and state aforesaid, of the other part, witnesseth :

The said Mallory & Legg agree to deliver, or cause to be delivered, at the Hopeton Mills, during the time of navigation, a quantity of good merchantable wheat, be the same more or less, to be manufactured into flour, which the said Willis agrees to do as follows : For every four bushels and fifteen pounds of wheat, said Willis is to deliver ·to said Mallory & Legg, or their order, one˜ hundred and ninety-six pounds of superfine flour, packed in barrels well fitted for the purpose ; barrels to be furnished by said Mallory & Legg. Said Willis to guaranty the inspection of said flour—if scratched, to pay all losses sustained thereby. Said Mallory & Legg to have all the offals, or feed, &c. ; said Willis to store the same until sold. And further, by said· Willis performing on his part as above stated, said Mallory & Legg agree to pay him sixteen cents per barrel. Witness our hands, &c.

If said Mallory & Legg make one shilling net profit on each and every barrel of flour made at said mills, they are to pay said Willis two cents per barrel extra."

In pursuance of the above agreement, the plaintiffs delivered at the Hopeton Mills, 32,586 bushels and four pounds of wheat, which Christopher Willis manufactured into superfine flour ; and the evidence tended to show that the 75 barrels of flour in question, was the surplus left after delivering to the plaintiffs 7,667 barrels and 156 pounds of flour, equal to 196 pounds for every four bushels and fifteen pounds of wheat. The defendants insisted that the title to the wheat passed to Willis by force of the contract, and the delivery thereunder ; and, therefore, that the plaintiffs could not recover the flour manufactured [78]

from the same wheat. Justice PRATT held that the contract was one of bailment and not of sale; that the title to the wheat did not pass; and that the plaintiffs were entitled to recover, unless the defendants proved that the 75 barrels was the surplus flour after delivering to the plaintiffs 196 pounds for every four bushels and fifteen pounds of wheat delivered under the contract. The defendants excepted. The Justice (the case being tried without a jury) found for the plaintiffs, and judgment was rendered accordingly, which was affirmed at the general term of the supreme court. The defendants appealed to this court.

*J. S. Glover,* for appellants.

*S. H. Wells,* for respondents.

HURLBUT, J. If the contract was one of bailment, and if by a proper construction of it the defendants were entitled to the surplus flour, I think the burthen would have rested on them of showing that the article in question was such surplus, after the plaintiffs had established that it was the produce of their wheat; so that taking the most favorable view for the defendants, there was no error in point of law in this branch of the decision at the circuit, which would entitle them to except, and the only question for our decision is, whether the contract and the delivery under it, amounted to a sale or a bailment of the wheat?

The defendants refer us to that part of the contract which binds them to deliver a barrel of superfine flour and to guaranty its inspection, for every $4\frac{1}{4}$ bushels of wheat, which it is alledged, if the plaintiffs' construction is to prevail, is not only an unreasonable and hard contract for the defendants, but is altogether inconsistent with the notion of a bailment; for it is asked, if it were not a sale, why should the defendants guaranty that the flour should bear inspection, or why should they agree for a certain quantity of wheat to deliver a barrel of flour? It [79] may be remarked in answer to this, that the defendants

Mallory *v.* Willis.

being experienced millers must be deemed to have contracted with a knowledge of the quantity of wheat required to yield a barrel of flour; and as the plaintiffs were obliged by the contract to deliver good merchantable wheat, it seems but reasonable that the defendants should have been required so to manufacture it, as that the flour would bear inspection : that these provisions must be viewed in the connection in which they stand, and receive a construction which shall make them harmonize with the whole expression of the contract between the parties ; and that taking the whole agreement into view, they seem to have been inserted at the suggestion of the plaintiffs, for the purpose, in part, at least, of causing a skilful and prudent manufacture of the wheat into flour ; and even if they were employed to define the quantity of flour to be returned, they would not overbear the other provisions of the agreement, which impo........ly an understanding between the parties that the ide.......wheat which was delivered by the plaintiffs, should be manufactured into flour for their benefit; that they were to pay for the work a stipulated price in money, and to receive the manufactured article, together with the offals or feed, which should come from the wheat. The language of the agreement will hardly bear a different construction. The plaintiffs by its terms were to deliver wheat *to be manufactured into flour*, which Willis *agreed to do*—i. e. he agreed to manufacture the wheat so to be delivered into flour. But this provision would be entirely out of place in an exchange of wheat for flour. The plaintiffs were to furnish the barrels in which it was to be packed ; thus providing every material for the completion of the work, and leaving nothing for Willis to do but to perform the proper labor of a manufacturer. The plaintiffs were moreover to have all the offals or feed, &c. ; not such a quantity of offals as would proceed from a like quantity of other wheat, but *the* offals or feed—i. e. such as should come of grinding the very wheat delivered to the miller, who was also to store the feed until the plaintiffs could sell it. And in case Willis performed on his part, i. e. in case he manufactured the wheat so delivered into flour, with the requisite skill and prudence, [80]

the plaintiffs were to pay him at the rate of 16 cents, or in a certain contingency 18 cents per barrel, as a compensation for the labor of manufacture. Proper effect cannot be given to these provisions of the agreement, without treating it as a contract by the defendants to manufacture the plaintiffs' wheat into flour, to deliver to them the specific proceeds, at least to the extent mentioned in the contract, and to receive in satisfaction for the work the stipulated price per barrel. Contracts of this sort which have received a different construction will be found to have differed very materially from the present in their terms, as will be seen by a brief reference to the leading cases.

In *Buffum* v. *Merry,* (3 *Mason's Rep.* 478,) the plaintiff owned 2900 pounds of cotton yarn, and agreed to let one Hutchinson take it at the price of 65 cents per pound, and he was to pay the plaintiff the amount in plaids, at 15 cents per yard. H. was to use the plaintiff's yarn in making the warp of the plaids, and to use for filling, other yarn of as good a quality. Under this contract the yarn was delivered to H., who failed without having manufactured it into plaids, and assigned it with other property for the benefit of his creditors. The question was whether the property in the yarn passed to H. by the delivery; and Story, J. said that it did: holding that it was not a contract whereby the specific yarn was to be manufactured into cloth, wholly for the plaintiff's account and at his expense, and nothing but his yarn was to be used for the purpose. That in such a case the property might not have changed; but here the cloth was to be made of other yarn as well as the plaintiff's. The whole cloth when made was not to be delivered to him, but so much only as at 15 cents per yard would pay for the plaintiff's yarn at 65 cents per pound. That this was a sale of the yarn at a specified price to be paid for in plaids at a specified price. (*See also Story on Bailments, sec.* 283; *Jones on Bailments, p.* 102.)·

In *Ewing* v. *French,* (1 *Blackford's (Ind.) Rep.* 353,) the plaintiff delivered a quantity of wheat to the defendants at their mill [81] to be exchanged for flour. The wheat was thrown by the defendants into their common stock, and the mill was subse-

quently destroyed by fire. The court held this to be a contract of exchange, or a sale of the wheat to be paid for in flour; that from the moment the defendants received the wheat they became liable for the flour; that the wheat itself was not to be returned, nor the identical flour manufactured from it. And this was very well, for the contract was by its express terms, one of exchange.

In *Smith* v. *Clark*, (21 *Wend.* 83,) one Hubbard owned a flouring mill, and the plaintiffs agreed with him to deliver wheat at his mill, and he agreed that for every four bushels and 55 pounds of wheat which should be received, he would deliver the plaintiffs one barrel of superfine flour, warranted to bear inspection. Here was nothing which imported a delivery of wheat for the purpose of being manufactured, nor any agreement to make it into flour and to receive a compensation for so doing, at a certain price per barrel; and it is obvious that Hubbard might have delivered any flour of the quality stipulated for, in satisfaction of the contract. Hence it was held that the delivery of the wheat under this agreement amounted to an exchange of the wheat for flour, and that Hubbard on receiving the wheat became indebted to the plaintiffs.

In *Norton* v. *Woodruff*, (2 *Comst.* 153,) the defendant agreed to " *take*" wheat and to " *give*" them one barrel of superfine flour for every four bushels and thirty-six pounds of wheat; but here also there was the absence of a delivery for the purpose of being manufactured, no compensation was agreed to be given to the miller for his work, there was nothing about offals, and nothing about the wheat owner's furnishing barrels in which to pack the flour. On the contrary, the miller in this case was to furnish the barrels. This court gave proper effect to the language of this contract by holding, that the miller by agreeing to *take* wheat and *give* flour in return, had bargained for an exchange of wheat for flour; that any flour of the quality described in the contract would have answered its requirements, and that the property of the wheat passed upon its delivery.

But in the case under review, Willis contracted to [82] manufacture the wheat delivered, and to receive compensation

for his labor.  The flour, by which was intended the produce
of the manufacture, was to be delivered to the plaintiffs in their
own barrels, and the offals were to be kept in store as their
property.  These features give a character to this contract so
materially different from that which is borne by the agreements
which have received a judicial construction in the cases referred
to, that with the fullest concurrence in the justice of those de-
cisions, it may be held that the defendants were bailees and not
purchasers of the plaintiff's wheat, and bound to restore its pro-
ceeds to them.  I am, therefore, of opinion that the judgment
of the supreme court ought to be affirmed.

JEWETT, J.  Assuming that the evidence clearly shows, as
I think it does, that the flour in question was surplus flour,
arising from the wheat delivered under the contract after the
plaintiffs had received 196 pounds of superfine flour for every
four bushels and fifteen pounds of wheat; the finding of the
judge was erroneous and inconsistent with his previous decision :
but if the evidence did not prove that fact, in his opinion, the
finding was consistent with his opinion of the law of the case.
If the defendants intended to set aside the finding, on the ground
of its being against the evidence, or the weight of evidence,
they should have moved the supreme court for a new trial on
that ground upon a case made for that purpose.  That question
cannot be raised here on this appeal.  The only question here,
on the bill of exceptions is, whether the decision of the judge
upon the question raised as to the rights of the parties under
the contract was, or not, correct.  And not whether his finding
was right upon the facts proved.

The judge, in effect, decided that the contract between the
plaintiffs and Christopher Willis, was not one of sale or ex-
change, but of bailment for manufacture ; *locatio operis faciendi*.
And I am of opinion that he was correct in that construction.
So far as I understand the argument, to show it one of sale or
exchange and not of bailment, it rests chiefly, if not wholly,
[83] upon the absence of any *express* provision that the 196
pounds of superfine flour, for every four bushels and fifteen

pounds of wheat, should be delivered from the flour to be manu-
factured from the identical wheat delivered. But for what pur-
pose did the plaintiffs agree to deliver their wheat to Willis at
his mills? For sale, or exchange for flour? Clearly not. The
answer is to be found expressed in the contract—" to be manu-
factured into flour," and to have in return " all the offals or
feed," &c., and a certain quantity of flour, as the product of
the manufacture, which might or might not be the entire pro-
duct, but depending perhaps upon contingencies. Did Willis
intend to purchase or exchange flour for wheat? There is
nothing either in the language of the contract or in the sur-
rounding circumstances, which indicate it, but a contrary inten-
tion is plainly to be inferred as well from the circumstances as
the language of the contract. The contract says: " which
Willis agrees to do as follows," that is, to manufacture the
wheat when delivered, and of the flour to be manufactured, to
deliver the plaintiffs a specified quantity for each specified
quantity of wheat, packed in barrels to be furnished by the
plaintiffs, and all of the offals. In the absence of any express
stipulation to the contrary, there is no doubt but that the plain-
tiffs would be entitled to the whole wheat in its manufactured
condition, subject to the lien of Willis for a reasonable com-
pensation for his labor and skill expended in its manufacture,
or to the whole, less the customary part allowed to be taken as
a compensation for the manufacture in the shape of toll. Take
a common case, A. is a miller and has a flouring mill ; B. sends
his wheat to the mill to be manufactured into flour, no terms
being agreed upon for which it shall be done ; A. performs the
work and takes a certain proportion for his compensation, say
one-tenth, according to the custom of the trade. This would
amount to an implied contract of bailment for manufacture,
and not of sale or exchange ; and although it was not expressly
agreed between the parties, that the owner of the wheat should
receive his proportion of flour and offals from the identical
wheat delivered, yet I think no one will doubt but that would
be implied.

Take another case ; suppose A. has wheat which he de- [84]

Mallory v. Willis.

sires to procure to be manufactured into superfine flour, and agrees with B., who is a miller and has a mill, to manufacture it into such flour on delivery, and pack it into barrels to be furnished by A., for a specified money compensation, and all the flour which it should produce over a given quantity. No one will deny, but that the wheat delivered under the contract would be held by B. as a bailee for manufacture.

So, I apprehend, if one delivers wheat to another, who is a miller, at his mill, to be ground into flour, and the miller undertakes to do it, it would not make it any the less a contract of bailment, if instead of resting on the implied agreement to allow the miller to take the customary part as compensation by way of toll, or on an express agreement to pay a sum certain per barrel for the quantity of flour manufactured, in addition to allowing the miller to take a certain part of the flour manufactured as a compensation, the parties should agree that the owner of the wheat should receive in return, a specified quantity of flour for every given quantity of wheat delivered, and should pay a certain sum per barrel of flour to the miller as compensation for his skill and labor expended in the manufacture. The manifest inference from such an agreement would be, either that it was understood that the wheat, when manufactured, would not produce any greater quantity of flour than was agreed to be returned, or that if it would, the surplus, together with the sum to be paid, was intended as compensation for the work to be done.

The motive for providing by the contract for the quantity and quality of the flour that Willis should return as the product of the wheat when manufactured, may have been, to avoid all controversy which the parties may have apprehended might otherwise arise in regard to the performance of the contract by Willis; especially if it be a fact well understood by all who have any experience in the manufacture of wheat into flour, that there is little or no uniformity either in the quantity or quality of flour produced from a given quantity and quality of wheat, ground by different millers and mills.

[85] But whatever the motive was, the express provision re-

quiring Willis to return the offals and a specific quantity and quality of flour for a given quantity of good merchantable wheat, taken in connexion with the other provisions of the contract, implies the exclusion of any claim or right of the plaintiffs to any greater quantity of flour, whatever the quantity produced was, and I think it is fairly implied that the surplus, if any, was to belong to Willis. This construction of the contract in question I think is supported by the principle decided in *Norton* v. *Woodruff*, (2 *Comst.* 153;) as also in *Hurd* v. *West*, (7 *Cowen*, 752;) *Smith* v. *Clark*, (21 *Wend.* 84;) *Pierce* v. *Schenck*, (3 *Hill*, 28.) The judgment should therefore be affirmed.

RUGGLES, GARDINER, PRATT and TAYLOR, Js. were also of opinion that the contract was a bailment merely. They therefore voted for affirmance.

BRONSON, Ch. J. (Dissenting.) In cases of this kind the question is between a sale and a bailment; and as that is a point upon which the parties have not, in terms, declared their intention, either one way or the other, it must be settled by an inquiry concerning the nature and legal effect of the transaction. I think there was a sale, and not a bailment of the wheat : that the title passed to Willis on the delivery of the grain, and he became a debtor to the plaintiffs for the stipulated quantity of flour. The distinction which will be found to run through all the authorities on this subject, with the exception of two cases which have been overruled, is this ; when the identical thing delivered, though in an altered form, is to be restored, the contract is one of bailment, and the title to the property is not changed. But when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value, he becomes a debtor to make the return, and the title to the property is changed : it is a sale. (*Hurd* v. *West*, 7 *Cowen*, 752, 756, *note a ; Smith* v. *Clark*, 21 *Wend.* 83 ; *Baker* v. *Woodruff*, 2 *Barb.* 520 ; 2 *Comst.* 153, *S. C. in error, by the name of Norton* v. *Woodruff; Buffum* v. *Merry*, 3 *Mason*, 478; *Ewing* [86] v. *French*, 1 *Blackf.* 353 ; 2 *Kent*, 589 ; *Jones on Bail*, 102, 64 ;

*Story on Bail.* §§ 283, 439.) The rule is too well settled to be now drawn in question, and I think it decides the controversy between these parties; for although this case differs in words, it does not differ in principle from those which have been mentioned, where a delivery of property under a contract of this kind has been held to constitute a sale, and not a bailment. Willis was under no obligation to pay in flour made from the same wheat which he received; but he might perform his part of the contract by delivering flour of the proper quality and quantity made from any other wheat. The substance of the agreement—rejecting what is not material to the present inquiry —was, that the plaintiffs should deliver wheat, for which Willis should deliver flour and " offals" in return; and it was wholly unimportant from what particular wheat the flour and offals were made. The subordinate particulars—as the quality of the wheat and the flour, the proportion which the flour was to bear to the wheat, the mode of packing, who should furnish barrels, the warranty of inspection, and the amount to be paid by the plaintiffs in money—do not affect the nature of the transaction, or tend in any degree to prove that the flour was to be made from the particular wheat which the plaintiffs should deliver.

Some stress has been laid upon the words—" to be manufactured into flour, which the said Willis agrees to do;" but the whole force of the argument is broken by the additional words, " as follows"—" which the said Willis agrees to do *as follows.*" Now what follows? Not one word about manufacturing that particular wheat into flour; but only a stipulation to pay for the wheat in flour. This shows plainly enough that the plaintiffs were not contracting for work and labor upon their materials; but for an exchange of wheat for flour. That was the legal effect of the agreement.

It appears from the case that Willis has delivered the whole quantity of flour in pursuance of the contract. Now suppose it should turn out that a part, or even all, of the flour was made from other wheat than that delivered by the plaintiffs, and that [87] their wheat has not been manufactured at all, will any one say that they could for that reason re-take the wheat, or have an

action of any kind against Willis ? I presume not. It follows that Willis was at liberty to return flour without regard to the wheat from which it should be manufactured : and if such was the nature of the contract, it is fully settled upon authority, that there was no bailment, but a sale of the wheat. The title passed to Willis on the delivery of the grain ; the property was at his risk of accidents ; and he was a debtor for the stipulated quantity of flour.

Again : it is evident from the terms of the contract, when read with a knowledge of the business to which it relates, that Willis was to have the surplus wheat, if there should be any, after returning to the plaintiffs one barrel of flour for every four and one-fourth bushels of wheat which he should receive. Such I understand to be the opinion of most of my brethren. Now, why was he to have the surplus grain ? Not because there was any such stipulation, in terms, between the parties ; but because the legal effect of the transaction was to make Willis a purchaser of the grain, and a debtor for the price. And it is as a purchaser of the whole, and in no other way, that he acquired a title to the surplus wheat.

It has been said, that though Willis was to have the surplus wheat, the title to it did not pass until he had delivered the stipulated quantity of flour. This argument goes upon the theory that there was no sale at the time the wheat was delivered, which theory has, I trust, been shown to be false. But further ; if there was no sale at the time of the delivery, there is nothing in the contract from which it can be affirmed that there ever has been a sale, either of the whole, or any part of the grain. The parties did not agree that the title should pass when Willis had delivered the flour ; and for aught I can see the plaintiffs own the wheat still. The only theory which can give Willis a title to the surplus wheat, is that which gives him a title to the whole, by holding that there was a sale, instead of a bailment of the grain.

If decisions are made to turn upon mere verbal distinctions where there is no difference in principle, we shall soon have [88] a multitude of cases, but no general rules.

I am of opinion that the judgment is erroneous, and should be reversed.

HARRIS, J. (also dissenting.)   It is not easy to see how, upon the theory adopted by the judge at the circuit, he was led to the conclusion at which he arrived.   What he in fact decided is expressed somewhat obscurely in the bill of exceptions, but if I have correctly understood his construction of the contract, it was, that upon the delivery of the wheat to the defendants, they acquired no title to it, but were entitled to so much of the flour as remained, after delivering to the plaintiff the quantity specified in the contract.   He accordingly held that the defendants, to establish their title to the flour in question, must show that it was surplus flour, remaining after the delivery of 196 pounds to the plaintiffs for every four bushels and fifteen pounds of wheat received.   This fact appears to have been fully proved, and yet the decision was in favor of the plaintiffs.   This, however, was a question of fact, and though the learned justice may have erred in its decision, such error can not be corrected in an appellate court.   It is quite probable that if the cause had been tried with a jury, there might have been found in the charge of the court tenable ground of exception.   But in the mode of trial adopted by the parties, the defendants are deprived of this advantage. The only question therefore, for this court to consider, relates to the other branch of the decision at the circuit, whereby it was held that the delivery of the wheat under the contract, did not vest the title in the defendants.

However this question may be determined, all must agree, I think, that the case stands hard by the line which separates between bailments and sales.   It certainly presents some of the *indicia* of each of those classes ; and though judges will agree upon the principles which are to govern the decision, they may well differ in the application of those principles to this case.   By the terms of the contract, the wheat was to be delivered for the purpose of being manufactured into flour.   This the defendants [89] agreed to do.   It was also agreed that the plaintiffs should have all the offals or feed, and the defendants were to store the

same until sold. These provisions seem to favor the construction adopted at the circuit. On the other hand, the defendants were to deliver to the plaintiffs a specified quantity of flour for a specified quantity of wheat. They were to pack the flour in barrels to be furnished by the plaintiffs, and were to guarantee its inspection as superfine flour. Upon the performance of the contract on their part, the defendants were to receive sixteen cents per barrel, and two cents more upon a certain contingency. These provisions, though not inconsistent with the idea of a bailment, seem rather to favor the opposite construction.

Was it the intention of the parties that the identical wheat delivered by the plaintiffs should be returned to them in the shape of flour? If it was, the plaintiffs never ceased to be the owner of the wheat. Would the defendants' undertaking be discharged by the delivery of the quantity of flour specified, of the specified quality, whether such flour were made from the wheat received of the plaintiffs, or any other wheat? If so, then it was a contract of exchange, and when the wheat was delivered to the defendants, they became its owners. This is the test by which it is to be decided whether the contract was a bailment or a sale.

The inclination of my own mind is to the latter alternative. The parties undoubtedly contemplated the manufacture of the wheat into flour, and perhaps I ought to add, that the same flour made from the wheat delivered by the plaintiffs, would be delivered to the plaintiffs. But did the defendants bind themselves to do this? Could the plaintiffs have objected to any superfine flour the defendants had seen fit to deliver to them, on the ground that it had been made of other wheat than their own? Suppose the plaintiffs had failed to furnish wheat enough to stock the defendants' mill, and they had made other similar contracts with other persons. Would they have been bound to keep the wheat received under such contracts separate from that received under the plaintiffs' contract? If the defendants had received other wheat, and from all the wheat received at the [90] mill, had made one common stock for its supply, would they have violated their contract with the plaintiffs? I think not.

I think the contract would have been satisfied, on the part of the defendants, by the delivery of the requisite quantity of superfine flour, such as would bear inspection, whether made from the plaintiffs' or any other wheat. Whether the wheat they delivered made more or less than the stipulated quantity of flour, or whether the flour they received was actually made from that or other wheat, were questions which did not concern them. They had the thing which the contract authorized them to demand. It was all they stipulated for. Having received it, they were bound to be satisfied. Besides the flour, the plaintiffs were to have " all the offals or feed," &c. This clause, as I have already said, seems to point to the flouring of the wheat for the plaintiffs. But in view of the whole transaction, I think this provision is entirely satisfied by giving the plaintiffs the offal or feed made in the manufacture of the requisite quantity of flour for the plaintiffs. Nor do I think that the fact that the plaintiffs, in addition to the four bushels and fifteen pounds of wheat, were also to pay the defendants sixteen cents for each barrel of flour received from them, should affect the construction to be given to the contract. It is no uncommon thing in contracts for the exchange of property to equalize the value, by the payment of the difference in money. This seems to me to be nothing more. In legal effect, it could make no difference whether the price the defendants were to receive for their flour should be paid wholly in wheat, or partly in wheat and partly in money.

This construction of the contract will be found best to harmonize with the general current of decisions in analogous cases. These cases are collected, and the doctrine they sustain is well stated, in a very sensible opinion by Mr. Justice Welles, in *Baker* v. *Woodruff,* (2 *Barb.* 520, *since affirmed upon appeal.*) The only cases which favor the opposite construction, are *Seymour* v. *Brown,* (19 *John.* 44,) and *Slaughter* v. *Green,* (1 *Rand.* 3.) These cases have been so often and so decidedly disapproved, that they are no longer to be regarded as authorities.

[91] My opinion is that there was nothing in the agreement between the parties, which required the defendants to *return the*

*same wheat they received in the shape of flour,* and therefore according to the settled doctrine in such cases, the contract was in effect an exchange, and not a bailment. If so, it follows that the decision at the circuit, that " the title of the wheat did not become vested in or pass to the defendants by the delivery under the contract, but remained in the plaintiffs," was erroneous.

Judgment affirmed.