CHISHOLM v. EAGLE ORE SAMPLING CO.

(Circuit Court of Appeals, Eighth Circuit. March 7, 1906.)

No. 2,260.

BANKRUPTCY—PREFERRED CLAIMS—SALES—BAILMENT.

A contract for the reduction of ore between claimant and the T. company, the bankrupt's predecessor, provided that the claimant should deliver ore to the T. company for reduction on a schedule of treatment rates which included freight to the mill, that settlement for all ore shipped by claimant to the T. company should be based on the latter's weights and samples, that, in case of disagreements as to assay values, the same should be submitted to certain arbitrators, and that payments for all gold ore delivered should be made by the T. company promptly on agreement as to assay values, on a basis of $20 an ounce for gold, less treatment charges. On delivery of ore each car was numbered and weighed, a test made to determine moisture, and samples taken and divided into three parts—one for the claimant, one for the T. company, and a third for the umpire in case of dispute—after which the ore was mixed with ore shipped by others, and it was then impossible to identify claimant's ore. All risk of loss through theft or failure of the ore to come up to sample value was on the T. company, and settlements were made by a check of the latter, in which it was treated as a debtor. *Held*, that the contract construed by the parties' method of business operated as a sale of ore delivered and not as a bailment, so that claimant was not entitled to a preference in the distribution of the assets of the T. company's bankrupt successor.

Appeal from the District Court of the United States for the District of Colorado.

See 133 Fed. 84.

This is an appeal by the trustee in bankruptcy from an order allowing as preferential a claim of the Eagle Ore Sampling Company against the estate of the General Metals Company, a bankrupt. The claim asserted and allowed was the result of transactions under a contract between the claimant and the Telluride Reduction Company. The bankrupt, Metals Company, acquired the business of the Telluride Company, and assumed its place in the contract, and therafter the dealings were between the claimant and the bankrupt. The following abridgement of the contract sufficiently presents those features which require consideration; the claimant being therein referred to as the Sampler Company, and the predecessor of the bankrupt as the Mill Company: "Said Sampler Company will deliver to said Mill Company * * * all of the gold ore which it receives from leasers and from mines not under contract to other reduction works, such ores are to be delivered upon the schedule of treatment rates specified below as Open Rates, which include freight to said mill, deliveries to be f. o. b. Cripple Creek District. * * * Settlement for all ores shipped by said Sampler Company to said Mill Company, whether from the leasers or upon regular time contracts, shall be based upon the said Mill Company's weights and samples, and said Mill Company is to supply the necessary control samples for umpire. In case of any disagreements during the first year of this agreement as to assay values of ore, the same are to be respectively submitted by both parties to one of the following firms or individuals for decision for settlement; the party calling for such umpire to have the right to make the selection of one of such um-

pires. * * * Payments for all gold ore delivered by said Sampler Company to said Mill Company shall be respectively made by said Mill Company promptly upon agreement as to assay values and shall be upon the basis of twenty dollars ($20) per ounce for gold, less the treatment charges as set forth hereinbefore respectively."

Under this contract, ore, other than that now involved, was delivered by the claimant to the bankrupt and paid for by the latter; but, at the time of the institution of the bankruptcy proceedings, there remained deliveries of ore of the value of $52,259.57, for which no payment had been made. The contention of the claimant, sustained by the trial court, is that the contract contemplated merely a bailment of ore for treatment, that the title thereto did not pass to the bankrupt, and that therefore its claim was of a preferential nature.

Daniel B. Ellis and Charles W. Waterman, for appellant.

Edward C. Stimson (Curtis Nye Smith, on the brief), for appellee.

Before HOOK, Circuit Judge, and POLLOCK and CARLAND, District Judges.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is conceded that, if the transactions under the contract were by way of sale and not bailment, the claimant is a general creditor and is not entitled to a preference in payment over other creditors of its class. It will be well, in approaching this question, to first observe the settled distinction between a bailment and a sale.

In Powder Company v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973, it was said:

"It is contended that the question of bailment or not is determined by the fact whether the identical article delivered to the manufacturer is to be returned to the party making the advance. Thus, where logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be a sale or a loan, and the title to the thing delivered vests in the manufacturer. We understand this to be a correct exposition of the law."

In Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093, the rule is thus expressed:

"The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed. The transaction is a sale."

While the words usually employed to indicate an intention to transfer title such as "sell," "purchase," etc., do not appear in the contract under consideration, there is, on the other hand, nothing definitely showing that the claimant intended to retain dominion or control over the ore or the specific content values thereof after delivery to the bankrupt. It was provided that settlements should be made on the basis of the bankrupt's weights and samples, and that, when the

value of a lot of ore was determined by its weight and the assay of a sample there should be deducted thereform the charge for treatment and the balance should then be paid by the bankrupt to the claimant. The freight charges to the mill were to be paid by the bankrupt, and the amount thereof was absorbed in the specified rates for treatment. There is nothing to show that the claimant reserved the right to retake possession of the ore delivered, even in the event of a controversy over the value. On the contrary, the dispute was to be referred to an arbitrator for decision, and the provisions in the contract to that effect are followed by one requiring prompt payment by the bankrupt upon agreement as to assay values. After the taking of a sample of a lot of ore, no condition or restriction whatever was imposed upon the bankrupt as to the care, custody, treatment, or disposition of the remainder. In other words, the full right of disposition by the bankrupt was not postponed until ascertainment of the value of the sample or until payment to the claimant of the amount due.

While the true construction of the contract, regarding solely the letter thereof, is not altogether clear, the features referred to indicate the characteristics of a sale, rather than those of a bailment for treatment and return to claimant of the content values of the specific ore delivered.

But whatever doubts arise from the face of the contract are dispelled by the conduct of the parties under it. It is a familiar rule that, where there is uncertainty as to the true meaning and intent of the contracting parties, the construction which they themselves have put upon it by their voluntary course of practice, when no controversy existed, is always to be given very great, if not controlling, effect.

This is the way the business was conducted at the bankrupt's mill: Upon arrival, a car load of ore which was given a lot number was weighed, and afterwards the empty car; the gross weight of the ore being thereby ascertained. Subsequently a test was made to determine the amount of moisture. During the crushing of the ore onefiftieth part, supposed to represent as accurately as possible an average of the whole, was automatically removed for a sample, and this portion was then run through another set of rolls and ground more finely. From this was taken a smaller sample, varying from 12 to 15 pounds, which in turn was ground still finer, and from it the final sample lot of 18 or 20 ounces was taken. This final sample was divided into three parts; one for the claimant, one for the bankrupt, and the third for the umpire or arbitrator in case of dispute. Now the remainder of the original lot of ore when crushed or rolled and ready for treatment was put upon the bedding floor of the mill and mixed with ore shipped by other parties. No attention was thereafter paid by the claimant to its disposition by the bankrupt, nor was any attempt made to preserve its identity until payment upon the sample basis. It was then impossible to tell which was the claimant's ore and which the ore of others. The claimant had a representative at the mill who was fully cognizant of this procedure. All risk of loss through theft or failure to come up to sample value by reason of defective processes or otherwise was upon the bankrupt, and not upon the claimant.

Again, settlements upon the sample basis were made by the delivery to the claimant of voucher checks, to which was attached a form of receipt for its signature. Upon the face of each check appeared the words "The General Metals Company to the Eagle Ore Sampling Company, Dr." The amount of the check was expressed to be "in payment" for the ore indicated thereon by lot numbers. The detachable receipt specified that the amount was "in full payment of the above account." It also appears that the president of the claimant had at various times granted the bankrupt short extensions in the payment of the checks.

In view of the foregoing, it seems clear to us that the parties acted under the contract as though the transactions were sales of the ore upon the basis of the assay values of samples, and that this voluntary construction of theirs, before any controversy arose, is more in harmony with the letter of the contract than in conflict with it.

The order of the District Court is reversed, and the case remanded for further proceedings in accord with this opinion.