## In re SOUTHERN ARIZONA SMELTING CO.

### FREEMAN v. MARTIN.

(Circuit Court of Appeals, Ninth Circuit. February 13, 1917.)

#### No. 2824.

SALES ☞4(1)—SMELTING OF MINERALS—PURCHASE OF ORE.

A smelting company, desiring to acquire a smelter and site, entered into a contract with a mining company whereby such company agreed to erect a smelting plant and convey it, with the site, to the smelting company in return for the stock of the smelting company. The contract further provided that the mining company should deliver to the smelting company all kinds of ore produced by its mines to be smelted and reduced, the smelting and marketing to be done by the smelting company at the actual cost thereof, plus 5 per cent. interest on the cost of the property and plant, and provided that the ores should be sold to a third company, which was a party to the contract. No sale price for the ore was fixed, and no arrangement was made of any amount to be paid the smelting company receiving the ore, and, when it was reduced, transferring drafts for the purchase price to the mining company. The mining company also furnished funds for the smelting company's purchase of other ores. *Held* that, notwithstanding the smelter returns, delivered on the furnishing of ores, referred to them as being bought by the smelting company, no sale was made; the smelting company being only a bailee, and title to the slag, etc., remaining after smelting, did not pass to the smelting company.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 7.]

Appeal from the District Court of the United States for the District of Arizona; William H. Sawtelle, Judge.

In the matter of the bankruptcy of the Southern Arizona Smelting Company, a corporation, bankrupt. Suit by John R. Martin, as trustee in bankruptcy of the Imperial Copper Company, a corporation, against M. P. Freeman, as trustee in bankruptcy of the Southern Arizona Smelting Company, a corporation. From a decree for complainant, defendant appeals. Affirmed.

See, also, 231 Fed. 87, 145 C. C. A. 275.

Martin, as trustee in bankruptcy of the Imperial Copper Company, bankrupt corporation, brought suit against Freeman, as trustee in bankruptcy of the Southern Arizona Smelting Company, a corporation bankrupt, to determine the ownership and right of possession of many tons of flue dust and of slag, the residue and by-product of many tons of copper ore shipped by the Imperial Copper Company in the years 1908, 1909, and 1910 to the Southern Arizona Smelting Company, and which ores were by the Smelting Company, in the years before mentioned, smelted in its furnaces and reduced to copper bullion. The question presented to the lower court involved the ownership of the flue dust and slag. The findings of fact, which are not challenged, are very voluminous and may be summarized in this way:

The Copper Company was organized in 1903 to carry on mining operations, including smelting, etc. On May 11, 1904, the Copper Company authorized bonds to be issued, and executed a deed of trust to the Bankers' Trust Company of New York, conveying all the property it owned or might own as security for the bonds. On August 6, 1906, the Southern Arizona Smelting Company, the corporation bankrupt herein, was organized to mine, smelt, etc. When the Smelting Company was organized, in 1906, the directors of the Imperial Copper Company were E. B. Gage, W. F. Staunton, A. N. Gage, H. M.

Robinson, Selwin Eddy, F. M. Murphy, and V. L. Mason; the officers being E. B. Gage, president, W. F. Staunton, vice president and general manager, and A. N. Gage, secretary and treasurer. During the years 1907, 1908, 1909, and 1910, the following named persons were directors of the Smelting Company: E. B. Gage, W. F. Staunton, A. N, Gage, H. M. Robinson, F. M. Murphy; the officers of the Smelting Company being E. B. Gage, president, W. F Staunton, vice president and general manager, and A. N. Gage, secretary and treasurer.

On August 14, 1906, the Copper Company and the Smelting Company made a written contract. This agreement recited that, whereas the Smelting Company desired to acquire a smelter site, then owned by the Copper Company, and to have erected thereon a smelter, and especially desired to obtain contract for the ores of the Copper Company in order to have a basis on which to operate the smelter for outside customers' ores, it was agreed that the Copper Company would on a site owned by it build a smelter plant, to be erected and operated under the supervision of the Smelting Company's general manager, and upon completion the Copper Company agreed to sell the smelter site and plant, and "to furnish the Smelting Company with all ores of every kind produced from the mines of the Copper Company * * * that may be desired by the Smelting Company to be smelted and reduced by the Smelting Company" for six months from the date of the beginning of the operation of the smelter. The smelting, reduction, and marketing of such ore so delivered by the Copper Company was to be done by the Smelting Company at the actual cost thereof, plus 5 per cent. interest on the cost of the property and plant to the Smelting Company. In consideration of this agreement the Smelting Company was to issue to the Copper Company 7,995 shares of Smelting Company stock, fully paid, in payment for the real estate and plant to be conveyed, "and the contract for furnishing of the ore by the Copper Company to form the basis for the Smelting Company's operations in custom ores." The Smelting Company agreed to "take and reduce the ores so to be furnished by the Copper Company upon the terms and at the prices for smelting" set forth. The agreement was signed by the Imperial Copper Company, by E. B. Gage, president, and attested by A. N. Gage, secretary, and by the Smelting Company, by Ben Goodrich, president, and A. N. Gage, secretary. The court found that the Copper Company built the smelting plant and conveyed the same to the Smelting Company, and caused 7,995 shares out of 8,000 of capital stock to be issued and delivered to the Copper Company in accordance with the contract.

When the Smelting Company was ready to commence operations, it made a tripartite contract, dated December 16, 1907, with the American Metal Company of New York and the before-mentioned Imperial Copper Company. This agreement provided that the Smelting Company would sell upon the terms set forth to the American Metal Company the entire output of copper, then, or at any time during the existence of the agreement, "smelted, owned, or controlled" by it, which it guaranteed would not be less than 1,250,000 pounds monthly. Various clauses relating to delivery, drafts, etc., are included in this contract; but it is unnecessary to set them out. As a further inducement for the American Metal Company to enter into the agreement, the Copper Company guaranteed to the Metal Company the prompt and faithful performance by the Smelting Company of the terms of the agreement. This agreement was signed by the Southern Arizona Smelting Company, by E. B. Gage, president, and A. N. Gage, secretary, and by the American Metal Company, Limited, by J. Langeloth, president, and Julius Goldman, secretary, and by the Imperial Copper Company, by E. B. Gage, president, and A. N. Gage, secretary. On April 13, 1908, the Copper Company and the Smelting Company made another agreement. In this last-mentioned agreement it was agreed that the Copper Company, as a part of the agreement of August 14, 1906 (heretofore referred to), would make necessary improvements and extensions, and would accept in payment therefor 1,000 shares of the fully paid stock of the Smelting Company to be delivered as provided. In pursuance of this agreement, the Copper Company erected the plant and the Smelting Company issued to the Copper Company the 1,000 shares of stock about November 10, 1908. The smelter plant and railroad thereto, operated from about January, 1908, until about August

15, 1910, when it was closed down. Between 1908 and 1910, when the smelter ceased operation, the Copper Company shipped all ore which it extracted from its mines, and had the same smelted and reduced to bullion by the Smelting Company, in accordance with the terms of the original contract of August 14, 1906, and the bullion was sold by the Smelting Company to the American Metals Company according to the tripartite contract already referred to, dated December 16, 1907. The manner of transacting the business was as follows:

The Imperial Copper Company shipped its ore to the Smelting Company in carload lots. Both companies made assay of the ore so shipped. The assay of the Smelting Company controlled, unless there was a great variation, when the sample of each company was given to an umpire, who assayed the same, and the assay of the umpire was taken as final. Shipments of ore were made every day by the Copper Company to the Smelting Company; smelter returns upon each lot of ore sampled and assayed by the Smelting Company were made by it and given to the Imperial Copper Company. The form of return was: "Southern Arizona Smelting Co. Bought of Imperial Copper Company," etc. The net value of each ore shipment shown on each smelter return was credited to the account of the Imperial Copper Company on the books of the Smelting Company, and the amount was entered on the books of the Copper Company as representing the value of the ore so shipped by the Copper Company to the Smelting Company. The bullion was shipped by the Smelting Company and sold to the American Metal Company, the proceeds of the sales of the bullion being eventually received by the Copper Company, and by it were credited on its books to the account of the Smelting Company. Account sales were rendered to the Smelting. Company by the American Metal Company. The practice was for the Smelting Company to get a bill of lading from the railroad company for each car of bullion which it shipped to the American Metal Company, which bill of lading the Smelting Company indorsed and delivered to the Copper Company, with the smelting assay, showing approximate value, etc., attached thereto. The Copper Company would then draw a draft on the Metal Company in favor of the Development Company (a corporation referred to as a borrower from the American Metal Company) for 90 per cent. of the gross value, which draft the Copper Company would send to the Development Company in New York. The Copper Company would then also draw a draft for like amount on the Development Company and deposit the same to the Copper Company's credit with the Phœnix National Bank in Arizona. The amount of the draft covering the transaction was credited by the Copper Company on its books to the Smelting Company, and the Smelting Company made entry on its books of the total monthly amounts of such drafts as a charge against the Copper Company. When the Metal Company rendered its account for the bullion shipped, the balance was paid to the Copper Company in like manner as set forth, and such balance was credited by it on its books to the account of the Smelting Company, and each month the Copper Company charged the Smelting Company with the amount so received by it.

The Smelting Company kept no bank account. It made out vouchers, which were approved by its superintendent and by him sent to the Copper Company, which paid the vouchers and charged the amount against the Smelting Company, and made entries on the books of the Copper Company, and entries were also made on the books of the Smelting Company. Accounts between the companies were balanced monthly. The Smelting Company kept its own books of account and operating books, showing all amounts paid for it by the Copper Company.

The Smelting Company, did a general smelting business. When the Smelting Company purchased and paid for ores received from and smelted for persons other than the Copper Company, it drew orders on the Copper Company, and such orders were paid by the Copper Company and charged against the account of the Smelting Company. After the Smelting Company closed down, vouchers were presented to it and paid by the Imperial Copper Company up to. July 5, 1911, when the Copper Company was put into bankruptcy. At that time the books show that the Copper Company had paid out for the Smelting Company $26,887.71 in excess of all the amounts of money which it had credited to the account of the Smelting Company.

240 F.—4

It is unnecessary to set forth in detail the substance of the other findings of the court, further than to say that they pertained to the financial transactions of the Copper Company and of the Smelting Company, and to litigation instituted in 1911 in the state courts in Arizona by the Bankers' Trust Company against the Copper Company to foreclose a deed of trust and lien upon the shares of stock which had been pledged by the Copper Company to the Bankers' Trust Company to secure the payment of certain bonds. In this litigation, Martin, as trustee, intervened, and it resulted that foreclosure was decreed by the state court and shares of the Smelting Company's stock were sold to one Goldschmidt, and sale confirmed and the stock transferred in April, 1915. Martin v. Bankers' Trust Company (Ariz.) 156 Pac. 87.

As conclusions of law, the United States District Court has found that the Smelting Company was a subsidiary of the Copper Company, created and used by the Copper Company for its convenience in the transaction of its business; that the ore shipped by the Copper Company to the Smelting Company, and the title thereto, as well as the title to all of the flue dust and slag dump, remained in the Copper Company; and that Martin, as trustee, is entitled to possession of the property. Decree in accordance with the findings and conclusions was made, and Freeman, as trustee in bankruptcy of the Smelting Company, appeals.

Selim M. Franklin, of Tucson, Ariz., and Everett E. Ellinwood, John M. Ross, and Leslie C. Hardy, all of Bisbee, Ariz., for appellant.

Francis M. Hartman and Edwin F. Jones, both of Tucson, Ariz., for appellee.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The point in the case being, who has the title and right of possession to the dust and slag involved, we will first consider the rights of the parties under the contract of August 14, 1906. The recitals contained in that agreement refer to the Smelting Company as organized for the purpose of carrying on a general smelting and reduction business and purposes incidental thereto, and to the Copper Company as a producer of ores carrying copper and other valuable materials. Reference is also made to the fact that the Copper Company had acquired a valuable smelter site, and to the desire of the Smelting Company to acquire the smelter site and "have erected thereon a smelter plant," and to the special desire of the Smelting Company "to obtain a contract for the ores of the Copper Company in order to have a basis on which to operate the smelter for outside customer's ores." The consideration for the agreement was based upon the covenants and agreements made and to be kept by the parties. The covenant of the Copper Company was to erect a smelting plant, and, upon completion, to sell and convey it to the Smelting Company, with certain land, embracing 640 acres, and also "to furnish the Smelting Company with all ores of every kind produced from the mines of the Copper Company * * * that may be desired by the Smelting Company to be smelted and reduced by the Smelting Company," the "smelting, reduction, and marketing of such ores so delivered" to be done by the Smelting Company at the actual cost thereof, plus 5 per cent. interest on the cost of the property and plant to the Smelting Company, to wit, $800,000. In consideration of these things, the Smelting Company agreed to issue to the Copper Company 7,995 shares of its stock in payment for the

real estate and plant to be transferred, "and the contract for the furnishing of the ore by the Copper Company to form a basis for the Smelting Company's operations in custom ores," and the Smelting Company also agreed "to take and reduce the ores so to be furnished by the Copper Company upon the terms and at the prices for smelting set forth in the agreement."

We do not find any contract for the sale of the ores to the Smelting Company in these covenants. The contract specifically binds the Copper Company to sell and transfer by deeds, bills of sale, and other instruments to the Smelting Company the land and smelting plant; but there is a marked contrast between the language used in agreeing to sell the land and smelter, and that which pertains to the ore to be furnished for smelting. The land and plant were to be sold, but with respect to the ore the covenant was simply "to furnish" the Smelting Company with all ores that "may be desired by the Smelting Company to be smelted and reduced by the Smelting Company." No sale price for the ore is fixed, and no arrangement is made for any amount to be paid as a purchase price.

But, furthermore, next after the covenants just referred to is the provision that "the smelting, reduction, and marketing of such ores so delivered" is to be done by the Smelting Company at the actual cost thereof, plus 5 per cent. interest on the cost of the property and plant to the Smelting Company, to wit, $800,000. Here again there are no words of agreement to sell the ore to the Smelting Company, but the imposition of an obligation upon the Smelting Company to do three things—smelt, reduce, and market for a compensation specified in clear terms as the value of the service. In providing for the marketing, as well as the smelting and reduction, we think it was evidently intended that the Smelting Company was to act as the agent of the Copper Company. Just what the actual cost of smelting and reduction might be would be dependent upon cost of the materials bought by the Smelting Company. When these sums would be ascertained, the percentage named was to be added. The Copper Company, under obligation to pay to the Smelting Company all costs of smelting, was entitled to receive the total product of the ore, and this product, we believe, would properly include the flue dust and slag.

It is argued by the appellant that the agreement of December 16, 1907, which was the contract between the Smelting Company, the American Metals Company, and the Copper Company, should be considered in connection with the contract of August 14, 1906, and that, when so considered, it shows an intention on the part of the Copper Company to sell its copper to the Smelting Company. But it was the original contract of August 14th which required the Smelting Company to market as well as smelt the ores delivered by the Copper Company under the terms of the contract of that date. When, therefore, the Smelting Company, fulfilling its original covenant to market the product of the ore, agreed with the American Metals Company to sell and deliver all of the copper bullion "smelted, owned, or controlled by it" at certain prices, and the Copper Company guaranteed to the Metals Company the prompt and faithful performance by the Smelt-

ing Company of the terms and provisions of the agreement on the part of the Smelting Company to be performed, the Copper Company did not transfer its ownership in the property to the Smelting Company, but at most guaranteed that the Smelting Company would deliver and sell all copper smelted, owned, or controlled by it to the Metals Company, under the terms named in the agreement, which would include the bullion owned by the Copper Company but in the possession of the Smelting Company, to be marketed by the Smelting Company as agent for the Copper Company.

The circumstances bear out the view that we have taken of these contracts. When a shipment of bullion was made by the Smelting Company, the bill of lading was attached to a draft drawn in favor of the Copper Company and turned over to it, and the proceeds of these drafts were received by the Copper Company; the Copper Company paying all the expenses of the Smelting Company. The Smelting Company turned over the draft for the product of the ore to the Copper Company, and seems not to have claimed any other nor greater compensation than the cost of the smelting, plus the 5 per cent., as agreed in the contract of August 14, 1906. As we look upon the guaranty by the Copper Company of the performance of the contract on the part of the Smelting Company as not a transfer of the title to the property to the Smelting Company, which merely held for the Copper Company, the true construction of the tripartite agreement is that the Smelting Company, in the sale of the bullion, acted solely as the agent of the Copper Company and for its benefit, and with knowledge on the part of the Copper Company, and the assurance by it that the Smelter Company would market with the Metals Company. In re Galt, 120 Fed. 64, 56 C. C. A. 470; In re Columbus Buggy Company, 143 Fed. 859, 74 C. C. A. 611.

It is evident that there was the closest relationship between the Copper Company and the Smelting Company, and it is not unreasonable to regard their interrelated situation in connection with the apparently studied use of the language in the August contract which effected a sale of the land, and that which required the delivery of the ore to the smelter and the smelting and marketing by the Smelting Company. It is true that, in the smelter returns made to the Copper Company, the caption of the form used was, the Smelting Company "bought" of the Copper Company; but we do not think this circumstance conflicts with the reasons for concluding that the whole contract was as we have construed it. Sturm v. Boaker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093.

Appellants cite Chisolm v. Eagle Ore Sampling Company, 144 Fed. 670, 75 C. C. A. 472. The question there involved arose upon the construction of a contract for the reduction of ore between the complainant in the case and a smelting company. The Sampling Company agreed to deliver to the Mill Company all of the ore which it received from leasers and mines, the ores to be delivered upon the schedule of treatment rates, which included freight deliveries, etc. Settlement for all ores shipped was to be based upon the Mill Company's weights and samples, and payments for all ore delivered were to be made by the

Mill Company promptly upon agreement as to assay value upon the basis of $20 per ounce for gold, less treatment charges as set forth in the agreement. The Court of Appeals said that the true construction of the contract, regarding solely the letter thereof, was not altogether clear, but the features pertaining to settlements and payments of freight charges and requirements for payment upon agreement as to assay values were held to indicate the characteristics of a sale rather than those of a bailment for treatment and return of the content values of the specific ore delivered. The court was confirmed in this view by the actions of the parties under the contract, which disclosed that the checks had been drawn "in payment" for the ores.

Our view being that the contract in question was in the nature of a bailment and not of a sale, we think it follows that the Copper Company is the owner of the flue dust and slag involved, and we affirm the decree based upon the finding to such effect. This conclusion renders it unnecessary to review the further conclusion of the lower court that the Smelting Company was a subsidiary and adjunct of the Copper Company.

Affirmed.