DECISION
Before this Court for decision is a petition by Thomas S. Hemmendinger (Receiver), as the Receiver for R-One Alloys, Inc (R-One), for instructions as to the account of Touchstone Metals, LLC (Touchstone). Touchstone filed an objection to the Receiver's petition for instructions, as well as a motion to compel the turnover and release of proceeds related to the Touchstone account. The Receiver filed a timely objection thereto. Jurisdiction is pursuant to G.L. 1956 § 8-2-13.
 FACTS AND TRAVEL
Prior to February of 2004, the Defendant corporation, R-One, as part of its business, refined scrap metal for customers. Some of these customers maintained "toll accounts" that were denominated in precious metals.[1] The largest of R-One's creditors, Touchstone, maintained a toll account in excess of one million dollars ($1,000,000).
On January 15, 2004, R-One ordered fifty fine troy ounces[2] of gold (Gold) to be transferred from its precious metals account with Sovereign Bank to the Fleet Bank account of T. Sardelli Sons, Inc. (Sardelli).[3] Fleet Bank rejected the transfer. R-One attempted, again, to transfer the Gold, but it was rejected a second time. Unbeknownst to Touchstone and R-One, Fleet had closed the Sardelli account, along with all other Sardelli accounts, when Sardelli was sold to a third-party resulting in all outstanding debts owed to Fleet being paid in full. At this time, the Gold remained in R-One's bank account.
On January 27, 2004, Jeffrey H. Sitkin, a stockholder and the president of R-One, petitioned this Court for the appointment of a receiver because he believed that the corporation was insolvent and unable to meet its obligations. On February 20, 2004, Thomas S. Hemmendinger, Esq. was appointed as the permanent Receiver of R-One.
Both the Receiver and Touchstone have asserted claims to, and an ownership interest in, the Gold.[4] On both May 26 and July 22, 2004, Sovereign Bank sent correspondence to the Receiver and Touchstone regarding the status of the Gold, stating that, if necessary, it would file a complaint for interpleader and have the Court determine ownership of the Gold. In order to limit legal fees that would attend such a complaint, Touchstone and the Receiver agreed to liquidate the Gold and have the proceeds held in escrow by the Receiver pending the resolution of the competing claims to the Gold. On September 2, 2004, counsel for Touchstone and the Receiver sent a letter to Sovereign Bank directing it to liquidate the Gold and forward the proceeds to the Receiver to hold in escrow, subject to the reserved rights of both the Receiver and Touchstone. The Gold was liquidated and on September 14, 2004, Sovereign Bank forwarded a check to the Receiver in the amount of $19,935.00 (Gold Proceeds).
On October 26, 2004, the Receiver filed a Petition for Instructions with this Court to determine the legal status of the toll account claims,[5] and requested that a hearing be scheduled to determine those instructions. Proper notice was given to all parties (including Touchstone), and on November 8, 2004, this Court held a hearing. Touchstone did not object to the Petition for Instructions. On November 22, 2004, this Court granted the Receiver's Petition for Instructions and made the following determinations:
 (A) All material in the Defendant's possession or on deposit in the Defendant's name with third parties is owned by the receivership estate, free of any Toll Account Claims.
 (B) The Toll Account Claims are general unsecured claims.
 (C) The amount of each Toll Account claim should be and is based on the market value of precious metals as of January 30, 2004, viz., $399.75 for gold, $6.265 for silver, $837.00 for platinum, and $230.00 for palladium.
On June 17, 2005, Touchstone filed a motion to compel the turnover and release of the Gold Proceeds. Subsequent to a July 13, 2005 hearing on these issues, the Court directed Touchstone to submit an additional brief on the nature of toll-refining transactions and the surrounding industry practice, and directed the Receiver to reply to this brief.
 ANALYSIS I.
The actions of the parties, the language of R-One's "Standard Refining and Trading Terms and Conditions" statement (Terms and Conditions Statement), the industry practice citations provided by Touchstone, as well as the relevant case law — all support the conclusion that Touchstone relinquished its ownership interest in the raw material, and the Gold contained therein, that it submitted to R-One. Because Touchstone had no ownership interest in the Gold or the Gold Proceeds, its claim is that of an unsecured creditor only.
 The Arguments
Touchstone asserts two theories in support of its contention that the Gold Proceeds are not part of R-One's estate: first, it claims that the basic metals contained in all Touchstone scrap metal refined by R-One, although temporarily in the possession of R-One, never ceased to be owned by Touchstone (as evidenced by general industry practice); second, Touchstone claims that R-One's instructions to Sovereign Bank to transfer the Gold to Sardelli, in conjunction with the later action of depositing the Gold Proceeds into an escrow account, effectuates, in essence, a complete pre-petition transfer that removed the Gold Proceeds from the Receiver's estate. To support its contention that the toll refining industry, both nationally and internationally, treats the refined metal as property that is continually owned by the refining customer, Touchstone cites to several disparate sources, including: a Swiss website dealing with Swiss made gold; the website of a mining engineering department of a Turkish university; the website of an African refining company; the website of an Alabama refining company; an article from an on-line Zimbabwe newspaper that mentions toll refining; an article from a geological survey produced by the United States Department of the Interior; and an article written by an attorney regarding the formation and usefulness of legal contracts in the area of toll refining. Touchstone does not assert a secured claim to the Gold Proceeds; rather, as aforesaid, it claims ownership thereof.
The Receiver contends that the toll refining transaction in this case is not indicative of the standard toll refining industry practice cited to by Touchstone. Conversely, the Receiver asserts that at issue is whether a bailment or a sale exists. In short, the Receiver claims that Touchstone sold the scrap material, and the metal contained therein, to R-One. Because Touchstone never expected R-One to return the identical gold delivered, the transaction was not a bailment and Touchstone, therefore, did not maintain ownership of the metal. Thus, the Receiver asserts that because Touchstone did not own the metal, it follows that it is not the owner of the Gold Proceeds.
 The Law of Bailment
A bailment has been defined under Rhode Island common law "as a delivery of personalty for some particular purpose, or on mere deposit, upon contract express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be."Don-Lin Jewelry Co., Inc. v. The Westin Hotel Co.,877 A.2d 621, 624 (R.I. 2005) (quoting Gallo v. American Egg Co.,76 R.I. 450, 456, 72 A.2d 166, 169 (1950); Emond v. Fallon,56 R.I. 419, 425, 186 A. 15, 18 (1936)). Although a bailment is usually created by agreement of the parties, a bailment relationship may be implied by law whenever personal property of one person is acquired by another and held under circumstances in which the principles of justice require return to the owner.See generally, 8A Am. Jur. 2d Bailments § 1.
As to whether a transaction constitutes a bailment or a sale, the United States Supreme Court stated over a century ago:
 "The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed. The transaction is a sale." Sturm v. Boker, 150 U.S. 312 (1893).
This rule applies even where the thing delivered is changed or transformed in some manner:
 "[W]here logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be sale or a loan, and the title to the thing delivered vests in the manufacturer. We understand this to be a correct exposition of the law." Powder Company v. Burkhardt, 97 U.S. 110, 116
(1877).
Some courts have chosen to call this type of bailment "`a bailment . . . locatio operis faciendi [i.e.] a bailment where work and labor . . . are to be performed upon the thing delivered to the bailee.'" B.A. Ballou and Company, Inc. v. Citytrust,591 A.2d 126, 130 (Conn. 1991) (quoting Douglass v. Hart,131 A. 401, 402 (Conn. 1925)). A bailment of this character is formed when bailor pays an agreed-upon compensation for the services the bailee performs in altering the bailed thing, which is then returned to the bailor. Id.
The case of B.A. Ballou and Company, Inc. v. Citytrust, is significant because it gives a detailed exegesis of the law of bailment in the context of commingling and remanufacturing. InBallou, the court determined that where a bailed thing has been transformed and commingled, and where the bailee does not require or expect the identical thing to be returned — the bailee loses title to the thing claimed to be bailed. Id. The court noted that the most important factor is whether the thing delivered is identical to the thing returned. Id. The commingling of bailed goods does not, in and of itself, defeat a bailment. Id. at 129-30. But where the bailment is a "bailment locatio operis faciendi," and the bailed thing is to be commingled with other things — a different rule applies. Id. at 130. In this situation, the fact that the bailed thing is commingled and altered, title passes from the bailee to the bailor.[6]
 The R-One/Touchstone Toll Account Transaction
In a typical refining transaction, R-One would credit the toll accounts of customers based on the sampling and weighing of delivered raw material before the material entered the refining process. In the stipulation of facts signed by Touchstone, Touchstone acknowledged that it "had an ongoing business relationship with R-One whereby it provided goods and services to R-One in the form of precious metals on toll accounts [,] [and that] Touchstone served as R-One's main supplier of metal for manufacture of fabricated products." Stipulation of Facts, ¶ 5. Touchstone also stipulated that "R-One refined scrap metal for its customers for which service said customers would either receive net payment in cash or maintain a toll account with R-One that was denominated in quantities of precious metals."Stipulation of Facts, ¶ 4. Thus, according to these stipulated facts, Touchstone never held an expectation that the identical metal contained within the raw scrap material would be returned. Instead, Touchstone expected to receive equal value or an equal amount of gold that was equivalent to the sampled and quantified amount contained in the pre-refined raw material. This is the very nature of toll accounting. Furthermore, it also appears likely that Touchstone knew exactly where the metal from the raw material was going — to be used as the basis of R-One's
manufactured products.
This transaction is substantially similar to another case which dealt with toll refining. In the case of Chisholm v. Eagle OreSampling Co., 144 F. 670 (8th Cir. 1906), the court there faced a similar set of facts. In Eagle Ore, a typical business transaction involved the delivery of ore by rail car, that was subsequently weighed and sampled. Id. at 672. The small sample was then crushed, rolled, ground, and divided between the refiner, the customer, and a neutral arbiter. Id. The bulk of ore that was not sampled entered the refining process, commingled with the ore of other customers. Id. Based on the weight and sample of the ore, the refiner then paid the customer with a check that identified the specific lot of ore that had been weighed and sampled. Id. at 673. On occasion, a credit was permitted. Id. The court concluded that "[i]n view of the foregoing, it seems clear to us that the parties acted under the contract as though the transactions were sales of the ore upon the basis of the assay values of samples." Id.
Similarly, after R-One sampled and weighed the material delivered by Touchstone, a credit was made to Touchstone's toll account. At no point subsequent to the material entering the refining process was Touchstone able to claim control over the material or the metal contained therein, because the material was commingled with the material of other customers. Accordingly, because Touchstone did not require that the identical metal contained in the material be returned, a sale resulted.
 R-One's Terms and Conditions Statement
R-One's Terms and Conditions Statement supports this conclusion. Section 3(d) of the Terms and Conditions Statement notes that "[o]n the release of Material into our refining process in accordance with Section 9 hereafter, Customer shall have no further rights in respect to any Material, for which full instructions were not given to prior to delivery, or any proceeds arising from the sale of such Material." Section 9, in effect, states that the release of material into the refining process takes effect after weighing and sampling. Thus, at the very least, the Terms and Conditions Statement suggests that R-One intended for title to pass when the material entered the refining process, and that Touchstone was on notice of this intention. This language, in conjunction with the fact that the actual, identical gold was never returned, supports the conclusion that Touchstone did not maintain ownership in the metal contained in the raw material once it entered the refining process, because it states that the Customer (Touchstone in this case) has "no further rights in respect to any Material" once it has entered the refining process.
 Industry Practice
Touchstone cites to a variety of publications, ranging from the website of the mining department of a Turkish university to an article from an on-line Zimbabwe newspaper, to show that metal refiners and their customers, across the globe, acknowledge that material delivered by customers to refiners is continuously owned by the toll refining customer. For example, one such document states:
 Each refining transaction is negotiated individually between the refiner and the customer. Ordinarily, refining schedules or outlines of services, capabilities, and charges are used by refiners to establish the basis upon which negotiations will proceed. Included in these negotiations are lot size and character of the product to be refined. Other factors may be the minimum or standard treatment charges, charges for preparation and assaying, charges or penalties for the presence of deleterious elements, and instructions regarding the basis of payment. The customer may elect to sell the material outright, may have the scrap refined and the gold prepared to contract specifications and returned (toll refining), or may elect to draw an equivalent value of refined metal from a pool account established by the refiner. (Emphasis added.) See
Earle B. Amey, U.S. Dept. of the Interior, U.S. Geological Survey, Gold Recycling in the United States in 1998 A5 (2004), available at http://pubs.usgs.gov/circ/2004/1196am/c1196am.pdf.
This survey notes that toll refining is defined as a transaction whereby a customer delivers raw material to be refined, and to whom the extracted precious metal is then returned. But the author proceeds by distinguishing a toll refining transaction from a toll accounting transaction, or what the author calls a "pool account" — the very distinction the Receiver highlights in his own memoranda.
Ultimately, this document, like all of the other documents cited to by Touchstone, does not address what is truly at issue: whether toll accounting, or "pool accounting," is a transaction where the toll refining customer retains ownership of the metal throughout the refining process. Regardless of this absence, this Court finds the case law regarding bailment to be controlling. R-One never returned the identical metal (toll refining); it only credited an equivalent value to an account tracking its debt to Touchstone (toll accounting or "pool accounting"). Thus, oddly, the industry practice documents cited by Touchstone support the contentions of the Receiver. There is no bailment. The toll accounting transaction amounted to a sale of the Gold and the material to R-One.
It should be noted that this Court's decision does not rest primarily on the language of the Terms and Conditions Statement, nor does it rely only on the statements regarding industry practice. Instead, as the courts in Sturm, Burkhardt,Ballou, and Eagle Ore determined, the dispositive factor as to whether a bailment or a sale exists, and thereby whether Touchstone owns the refined metal, is grounded in whether the identical thing delivered is to be returned. Here, R-One did not have to, nor did it, return the identical thing that was delivered. Accordingly, the scrap material and the gold metal contained therein was sold by Touchstone to R-One.
 II. Transfer into Escrow
The remaining question for this Court is whether R-One's attempt to transfer the Gold to the Sardelli Fleet account amounts to an action which effectuates ownership rights within Touchstone. Touchstone's contention (and the attendant citations), that there was a completed transfer even though Fleet rejected the two transfers, is incorrect. The bankruptcy cases to which it cites stand for propositions that have little to do with what actually occurred in this case. To be certain, these cases make clear that the transfer of funds is completed when the debtor deposits the funds into an escrow account, In re Pan AmCorp., 138 B.R. 382, 388 (Bankr. S.D.N.Y. 1992); In re AnthonySicari, Inc., 144 B.R. 656, 661 (Bankr. S.D.N.Y. 1992), and that a growing number of bankruptcy courts hold that funds transferred pre-petition and held in escrow are not property of the estate,In re Ceder Rapids Meats, Inc., 121 B.R. 562, 567 (Bankr. N.D. Iowa 1990). Put simply, however, R-One did not instruct Sovereign to transfer the Gold Proceeds into escrow for the benefit of Touchstone.
A party creates an escrow account when it delivers a sum to a third party, the escrow agent, for him or her to hold until the performance of some condition, whereupon the sum is then delivered to the other party to the transaction. Grand Pac. Fin.Corp. v. Brauer, 783 N.E.2d 849, 859 (Mass. 2003). Furthermore, the "depositor must not only relinquish control of funds but give the party holding funds instructions and have the party agree to status as escrow agent to create an escrow." In re Mason,69 B.R. 876, 883-4 (Bankr. E.D. Pa. 1987) (quoting In re ABW,Inc., 29 B.R. 88, 89-90 (Bankr. D. Nev. 1983)). The intention of the parties, which is generally a question of fact, determines whether an instrument placed with a third person constitutes an escrow agreement. 28 Am. Jur. 2d Escrow § 7 (2006).
The only facts before this Court regarding Touchstone's contention that an escrow account was created are that R-One attempted, twice, to transfer funds to the Sardelli Fleet account, and that those attempts were rejected. There is no evidence that the parties intended or agreed to create an escrow account. In fact, the most fundamental elements of an escrow account are noticeably absent: not only did R-One never relinquish control of the Gold Proceeds, but it never even placed the Gold Proceeds with a third-party with instructions that it be held in escrow. The only evidence of an escrow agreement is the one created nine months after these two rejected transfers. This subsequent agreement, however, is certainly not the completion of those initial transfers. Accordingly, pursuant to this Court's November 22, 2004 order, because the Gold Proceeds were never transferred to Touchstone and remained in the possession of R-One, they are thereby part of the Receivership's estate.
 Conclusion
Touchstone's motion for the turnover and release of the Gold Proceeds is denied. Consistent with this Court's November 22, 2004 order, the Gold Proceeds are part of the Receiver's estate; any further claims to the Gold Proceeds is therefore an unsecured, unperfected claim.
Counsel shall submit an order in accordance with this decision.
[1] Put simply, the term "toll account" is an industry phrase that refers to an account of credit that is usually delineated by the type of precious metal (such as silver or gold) that has been refined from a raw material. The toll account is used as a tool to track the refiner's debt to the refining customer. For example, if ten (10) ounces of silver is to be refined from a piece of scrap metal for Customer A, then a credit of ten (10) ounces of silver will be made to Customer A's toll account of silver.
[2] Troy weight is defined as "[t]he standard system of weights used for the precious metals and precious stones; formerly also for bread." II The Compact Edition of the Oxford EnglishDictionary 3418 (1971). Troy weight originates from the troy system of mass. Id. The common opinion is that it took its name from a weight used at the fair of Troyes in France. Id. The troy pound contains 5760 grains, and is divided into 12 ounces.Id. "A troy ounce, the only currently used unit of the system, is 480 grains, somewhat heavier than an avoirdupois ounce (437.5 grains). A grain is exactly 64.798 91 mg, hence one troy ounce is exactly 31.1034768 g, about 10 per cent more than the avoirdupois ounce, which is exactly 28.349523125 g. The troy ounce is the only ounce used in the pricing of precious metals, such as gold, platinum, and silver, and this is the only remaining use of the troy ounce." See Wikipedia: Troy Ounce, http://en.wikipedia.org/wiki/Troy_ounce. Accordingly, the 50 troy ounces of gold translates to roughly one and half kilograms, or approximately three and a half pounds.
[3] It was R-One's regular business practice to transfer refined gold to Sardelli, a 51% interest holder of Touchstone, as a way for R-One to pay down Touchstone's toll account. Touchstone had an on-going debt to Sardelli and had previously instructed R-One to directly pay Sardelli for Touchstone's benefit.
[4] Touchstone never filed a UCC-1 financing statement with respect to R-One.
[5] Prior to this, on March 8, 2004, Touchstone filed a Receivership Proof of Claim in the amount of $1,080,906.30 with regard to the toll accounts.
[6] One court did, however, find that a bailment could be created, even in the face of commingling and remanufacture, so long as the parties specifically contract for the formation of a bailment. See General Motors Corporation v. Bristol,690 F.2d 26, 30-31 (2d Cir. 1982). The precedent, however, to which the court in Bristol cites in support of this maxim, is misplaced. The court in Bristol cites to Public Service Electric GasCo. v. FPC, 371 F.2d 1 (3d Cir.), cert. denied, 389 U.S. 849,88 S. Ct. 33, 19 L. Ed. 2d 119 (1967) for the proposition that a "bailment locatio operis faciendi" is still created, even though there is commingling, when the parties contract for the creation of a bailment. Id. But, as the court in Ballou notes, PublicService Electric Gas Co. v. FPC stands only for the limited rule that commingling alone does not defeat a bailment.591 A.2d at 130. This Court agrees with Ballou's reading of PublicService Electric Gas Co. Thus, where a bailed thing is remanufactured and commingled, and where the bailee does not return the identical thing delivered, a bailment can not exist.