## POWDER COMPANY *v.* BURKHARDT.

An incorporated company entered into a contract with A., the owner of letters-patent for an explosive compound called "dualin," whereby he undertook to manufacture it, as required by the company from time to time, in quantities sufficient to supply the demand for the same, and all sales produced or effected by the company. The contract provided that all goods he manufactured should be consigned to the company for sale, and all orders he received should be transferred to. it to be filled; that the parties should equally share the net profits arising from such sales, and equally bear all losses by explosion, or otherwise, so far as the loss of the dualin was concerned, but the company assumed no risk on A.'s building or machinery; that the company should, semi-monthly, advance to him, on his requisition, a stipulated sum, for paying salaries, for labor, and for his personal account, and such further reasonable sums as might be required for incidental expenses of manufacture; and should furnish. him all the raw materials needed to manufacture said explosive 'in quantities sufficient to supply the demand created by the company, or should advance the money necessary to purchase them, — the said advances and the cost of such materials to be charged to him

against the manufactured goods to be by him consigned to the company. Certain of the materials which had been furnished him under the contract, and others which he had purchased with money advanced by the company, were seized upon an execution sued out on a judgment against him in favor of a third party. The company then brought this action, to recover for the wrongful conversion of the materials so seized. *Held*, that the delivery of them by the company to A. did not create a bailment, but that, upon such delivery, they, as well as those purchased by him with the money so advanced, became his sole property, and, as such, were subject to the execution.

ERROR to the Circuit Court of the United States for the District of Massachusetts.

This was an action in the nature of trover, by the Laflin and Rand Powder Company, of New York, against Gottlieb F. Burkhardt, for the alleged wrongful conversion of certain acids, glycerine, and other raw materials, bought by him under execution, as the property of Carl Dittmar.

At the trial by the court, a jury having been waived, the plaintiff put in evidence a contract entered into July 4, 1871, between Dittmar as party of the first part, and the company as party of the second part, which, after reciting that he was the inventor and discoverer of an explosive compound called by him "dualin," for which he had obtained letters-patent, and of which he was then engaged in the manufacture and production at Neponset, Mass., and that the company desired "to obtain, in connection with the said party of the first part, the sole and exclusive right to use and sell to others said 'dualin,'" provides as follows: —

"*First*, The said party of the first part agrees to manufacture and produce said 'dualin' in suitable packages and cartridges, as required by the said party of the second part, from time to time, in quantities sufficient to supply the demand for the same, and all sales of the same produced and effected by the party of the second part, it being fully understood and agreed that the said party of the first part has the sole and exclusive right to manufacture 'dualin,' except as hereinafter modified, and that the said party of the second part has the sole and exclusive right to sell such dualin under said letters-patent, and such sole and exclusive rights are hereby granted, fixed, and determined as aforesaid.

"*Second*, The dualin manufactured and put up by the party of the first part under this agreement, for sale by the party of the second part, shall be of the best quality in all respects, and shall be packed

in cartridges and packages to the satisfaction of the party of the second part, and according to its directions, by and through its executive officers.

" *Third*, All the goods manufactured by the said party of the first part shall be consigned to the said party of the second part for sale; and all orders for explosives given to or received by said party of the first part are to be turned over and transferred to the party of the second part, to be filled by it.

" *Fourth*, The said party of the second part hereby accepts the said sole and exclusive right of sale of said dualin, and engages to enter into the business of selling the same to the best of its power and ability, the principal design being to create a demand for the use of dualin, and to control the same for the joint interest of the parties concerned.

" *Fifth*, The net profits arising from such sales shall be divided equally, share and share alike, between the said parties, and shall consist of the difference between the actual cost of manufacture and the net proceeds of sales. Such cost of manufacture to include transportation to New York; but neither in such cost of manufacture or expenses of sale shall be included any charge for rent or use of buildings, storage on the premises of the parties, or insurance, other than marine insurance actually paid or personal commissions; and no sales shall be made at less than eighty (80) cents per lb., unless by consent of both parties.

" *Sixth*, Any and all losses, by explosion or otherwise, shall be borne equally by the said parties, so far as loss of the crude material or dualin is concerned; but the party of the second part assumes no risk on the buildings or machinery of the manufacturer.

" *Seventh*, Regular books of account, containing regular entries of all the matters pertaining to this agreement and the carrying out of the same in detail, shall be kept by the said parties respectively, and free access shall be had to the same at all reasonable times by both of said parties or their legal representatives; and statements shall be made embracing all the particulars above mentioned in full, so that the net profits can be ascertained by both parties from time to time, as and when required by either, but not oftener than once in three months. All the statements and accounts rendered and made out for the purpose of ascertaining the amount of the net profits shall be verified under oath by the party making or rendering the same, provided such requisition is desired by the other party. A division of net profits shall be made as above stated every three months.

"*Eighth*, The said party of the first part hereby guarantees the validity of the said three letters-patent, and agrees to defend the same, and to protect the said party of the second part in the rights hereby granted, and save them harmless in defending the same from any and all infringements thereof. The costs and damages of any suits in such protection or defence to be equally shared. The party of the first part agrees to pay the party of the second part, at the expiration of the contract, the half part of the costs belonging to the party of the second part, with interest annually.

"*Ninth*, This agreement is binding upon the heirs, administrators, executors, successors, and assigns of the said parties, and shall continue during the term of ten years; and in case the party of the first part shall make any new invention or discovery in explosives or explosive compounds, or any improvements therein or relating to the same in the matter of the explosion of the same or otherwise, the provisions of this agreement shall apply thereto in all respects the same as though incorporated therein at the beginning.

"*Tenth*, In case of the default on the part of the said party of the first part, or his failure to comply with and carry out the provisions of this agreement on his part, according to the true intent and meaning thereof, the said party of the second part shall have, and in that case the party of the first part hereby grants to the party of the second part, the license and right to manufacture dualin under said letters-patent for the aforesaid term of ten years, and to sell the same, subject to the provisions of this contract, or to the division of net profits; and, in order to provide for such case, the said party of the first part covenants and agrees to teach some person, to be named by the said parties and mutually agreed upon, the practical method of manufacturing dualin, in all the particulars and manipulations thereof, to the best of his knowledge and ability, so that the person above referred to may understand the same fully and practically in all respects.

"*Eleventh*, The party of the second part shall sell no other explosive compound than said dualin and common gunpowder, and such other explosives as may be manufactured by said party of the first part during the term aforesaid of this agreement, unless it shall be in the interest of both parties.

"*Twelfth*, The party of the second part shall advance to the party of the first part, on his requisition therefor, for the purposes of paying salaries, for labor, for incidental expenses of manufacture, and for his personal account, semi-monthly, an amount for salaries, $100; for labor, $200, if necessary; for his personal account, $250;

and such further reasonable sums as may be required for incidental expenses of manufacture; and shall also procure and furnish to the party of the first part, on his requisition, all the new materials needed to manufacture said explosives in quantities sufficient to supply the demand created by the party of the second part, or the money necessary for the purchase thereof, the said advances and the cost of such new material to be charged to said party of the first part against the manufactured goods to be consigned to the party of the second part as above provided."

The plaintiff then introduced evidence tending to show that the goods in the declaration mentioned were raw materials used in the manufacture of dualin, and were in the possession of Dittmar at his factory, for the purpose of being so manufactured under said contract; that the greater part of said raw materials had been procured and paid for by the plaintiff, and had become its property, and afterwards was furnished and delivered by it to Dittmar upon his requisition therefor, to be manufactured under said contract; that the balance of said raw materials had been purchased by him to be manufactured as aforesaid, with money furnished him by the plaintiff, upon his requisition therefor, under said contract, which requisition specified the amount required for each bill; that while the said raw materials were at said factory to be manufactured into dualin, under said contract, Burkhardt procured and directed them to be sold upon an execution issued upon a judgment in his favor against Dittmar, and that he bought them at the sheriff's sale upon said execution; and that afterwards, and before the bringing of this action, the plaintiff demanded them of the defendant.

The plaintiff further introduced evidence tending to show that, in the accounts between it and Dittmar, all the raw materials, when delivered by it to him, were charged in its books, together with the other expenses of the manufacture, to " dualin account," and said account was credited with the sales of dualin, and with the stock on hand, including the raw materials which he had at his factory; that he kept no book of charges, but kept a manufacturer's journal, in which was entered the materials as he received them, as well those delivered by the plaintiff as those purchased by himself; and that he

rendered the plaintiff a monthly return of the raw materials on hand at his factory, and a return so rendered Jan. 1, 1872, included all the goods mentioned in the pleadings. The plaintiff also introduced evidence of the value of the goods, and offered to show that the defendant had knowledge of said contract, and knew that said goods were furnished thereunder.

At the close of its evidence, the plaintiff requested the court to rule that the raw materials furnished and delivered by it to Dittmar, as aforesaid, remained its property, and that the raw materials purchased by him with the money it furnished, as aforesaid, were also its property; but the court refused so to rule, and ruled as matter of law, that under the provisions of said contract the raw materials furnished by the plaintiff became the sole property of Dittmar as soon as the same were delivered to him, and were liable to be taken for his debts, and that the raw materials which he purchased with the money advanced to him therefor by the plaintiff upon his requisition as aforesaid were also his property, and directed that judgment be entered for the defendant.

The plaintiff excepted in due time to the refusal to rule as requested, and to the ruling as made, and assigns them for error here.

*Mr. Francis W. Hurd* for the plaintiff in error.

Under the contract, the title to and property in the raw materials delivered by the company to Dittmar, to be manufactured into dualin, did not pass to him. The terms of the contract import a bailment of the raw materials, and not a sale or a barter of them. *South Australian Insurance Co.* v. *Randall*, Law Rep. 3 P. C. 101; *Barker* v. *Roberts*, 8 Me. 101; *Smith* v. *Jones*, 7 Cow. (N. Y.) 328; *Pierce* v. *Schenck*, 3 Hill (N. Y.), 28; *Mallory* v. *Willis*, 4 N. Y. 76; *Foster* v. *Pettibone*, 7 N. Y. 433; *Hyde* v. *Cookson*, 21 Barb. (N. Y.) 92; *King* v. *Humphreys*, 10 Pa. St. 217; *Stevens* v. *Briggs*, 5 Pick. (Mass.) 177; *Denny* v. *Cabot*, 6 Metc. (Mass.) 82; *Judson* v. *Adams*, 8 Cush. (Mass.) 556; *Schenck* v. *Saunders*, 13 Gray (Mass.), 37; *Mansfield* v. *Converse*, 8 Allen (Mass.), 182; *Buffum* v. *Merry*, 3 Mason, 478; Jones, Bailm. 107; Story, Bailm., sects. 283, 439; Edwards, Bailm. 340; 2 Kent, Com. 589.

The money sent to him was to be applied in purchasing

materials, which he was to hold for a specific purpose, as the company's property, and in trust for it.

*Mr. George Sennott, contra.*

MR. JUSTICE HUNT delivered the opinion of the court.

There is but a single question in the case; to wit, were the acids and other articles seized upon Burkhardt's execution the property of Dittmar? They were nearly all of them articles furnished to him by the Powder Company, under the agreement of July 4, 1871, or purchased with the money supplied by the company under that agreement.

Dittmar, having patents for the manufacture of explosive compounds, seems to have been in the condition, formerly so common to inventors, of possessing more science than money. What he lacked, the Powder Company professed to be ready to supply, and with the expectation of being compensated by receiving the one-half of the net profits to be made by the manufacture and sale of the said compounds. This was the general purpose and intent of the parties.

Among the clauses of the said agreement, the third, fifth, and twelfth may be referred to as illustrating its meaning.

The plaintiff in error contends that the present is the case of a bailment, and not of a sale or a loan of the goods and money to Dittmar. It is contended that the question of bailment or not is determined by the fact whether the identical article delivered to the manufacturer is to be returned to the party making the advance. Thus, where logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be a sale or a loan, and the title to the thing delivered vests in the manufacturer. We understand this to be a correct exposition of the law. *Pierce* v. *Schenck,* 3 Hill (N. Y.), 28; *Norton* v. *Woodruff,* 2 N. Y. 153; *Mallory* v. *Willis,* 4 id. 76; *Foster* v. *Pettibone,* 7 id. 433.

Adopting this principle, let us examine with more particularity the twelfth clause of the contract.   We find : —

1st, That the Powder Company there undertakes to " advance to the party of the first part " certain materials and certain moneys, some of which are obviously for his personal advantage.   To advance is to " supply beforehand," " to loan before the work is done or the goods made." · This is the popular understanding of the language, as well as the accurate definition. Dittmar was to make certain articles of sale, and the Powder Company undertook to supply beforehand, to loan to him before his goods were made, certain materials and moneys, to be used in part in making the goods, and in part for his personal benefit.

2d, This advance or loan was to be made upon the requisition of Dittmar, and was for the purposes following : To pay, semi-monthly, for salaries, $100 ; for labor, $200 ; for incidental expenses of manufacture, such sums as may be found necessary ; for Dittmar's personal account, $250.   These sums must necessarily be paid in money, and the title to the money must necessarily be in Dittmar, to be expended at his discretion. Especially is this true of the amount of $6,000 per annum advanced for " personal account."

3d, The Powder Company is to furnish to Dittmar, upon his requisition, all the raw materials needed to manufacture said explosives ; or,

4th, Furnish to Dittmar the money necessary for the purchase of said materials.

5th, The said advances and the cost of the raw material are to be charged to Dittmar against the manufactured goods to be consigned to the Powder Company, as before provided.

These various provisions show that the materials to be sent were to be delivered to Dittmar, to be in his actual possession and under his absolute control.   We see nothing requiring that the identical acids sent should be used in the manufacture of the explosives, and nothing to prevent an exchange by Dittmar for other materials, if he found any of the articles to be unsuitable, or if he found that he had too much of one kind and too little of another, acting honestly in the interest of both parties. The case is quite different from the single mechanical transaction of turning a specific set of logs into boards or a specific lot

of wheat into flour, where there is no room for judgment or discretion.

It will be observed, also, that the agreement to furnish money semi-monthly requires payments for Dittmar's personal account, as well as for the uses of the manufacture. This is significant to show that every thing was intrusted to Dittmar personally, and that the Powder Company relied upon the general result.

The agreement on the subject of providing materials concludes thus : " Or the money necessary for the purchase thereof." If the Powder Company had made these advances in money, which was received by Dittmar, and by him placed in his money-drawer, or deposited to his credit in bank, the money would have been his property, subject to the payment of his debts ; a part of his estate, in the event of his death or his bankruptcy. The request to charge, on which the only exception in the case arises, included both articles furnished and that purchased with the money furnished by the company. Both were placed by the counsel upon the same basis.

We think the goods *in specie* and the money, if it had been supplied, are subject to the same rules, and that they became the property of Dittmar, for which he was liable to account to the Powder Company, as for so much in value to be charged against the manufactured goods which are to be consigned to the Powder Company.

The " advances and the cost of the raw material are to be charged to the said party of the first part, against the manufactured goods to be consigned to the party of the second part." The charging to. Dittmar of money thus advanced to him assumes that the money becomes his, and a debt is thereby created to the joint account. The raw material is also to be charged to him, or charged against him, and in like manner becomes his property, for which he must account to the joint concern. These are to be charged to him against the manufactured goods, and these goods are to be consigned by him to the Powder Company. These expressions are strongly indicative of the intention to make Dittmar a debtor for the moneys and the materials furnished to him under the contract.

While it has been held that the expression " to be consigned

to the party of the second part " is not sufficient to show ownership in the party consigning, yet the general rule is conceded, that the party consigning goods is the presumed owner of them, and it may be taken into consideration in giving construction to a doubtful instrument. In this transaction, as has been already observed, there is no agreement to return or deliver the goods, but the word " consign " is evidently used in its place.

Again: it is by no means conclusive against the Powder Company that the agreement contains no reservation of title in the goods until they should be manufactured and consigned to them. Yet the New York Reports contain decisions upon many agreements containing such reservations, and its absence may be considered, among other things, in determining the construction of the contract.

So the circumstance that the subject of the contract was a patented article, and that Dittmar was the patentee, is not decisive, and yet is worthy of consideration. No one could lawfully use Dittmar's process for the manufacture of the article of " dualin," except himself. No one could lawfully sell it when manufactured, except himself. It was lawful for him to mix these materials and to produce the compound, but it was not lawful for the Powder Company to do so. It is, then, at least a fair argument to say, that when materials were sent and delivered to him to use in a manner which he only was authorized to use, and to produce a result which he alone was authorized to produce, that both the process and the materials, when there was no stipulation to the contrary, should be taken to be his.

The arrangement between the parties provided for its continuance for a period of ten years, and that the Powder Company should have the benefit of all improvements or discoveries made by Dittmar during that time; and that, if Dittmar failed to carry out his part of the contract, the Powder Company was licensed to manufacture dualin for the period named, under his patent; and, to enable them to do this, Dittmar promised to give such practical instruction to some person to be agreed upon as would enable the Powder Company to have the benefit of this provision.

These considerations, we think, show that the contract in question is very different from those which have been the subject of decision in the numerous cases cited. The Supreme Court of Massachusetts so considered it in the case of *Dittmar* v. *Norman* (118 Mass. 319), where this same agreement came under consideration. That was an action brought by Dittmar to recover the price of certain dualin manufactured by him under the agreement of July, 1871, and before the time when it was alleged by Dittmar that the contract had been violated by the Powder Company. The Powder Company claimed to be the owner of the dualin, and forbade payment by the debtor to Dittmar. The court held that the delivery of the materials to Dittmar did not create a bailment, that the title was in him, and adjudged that he was entitled to recover.

We think the ruling at the trial was correct.

*Judgment affirmed.*