In re LIEBIG et al.

Petition of HOLLEY.

(Circuit Court of Appeals, Second Circuit. November 13, 1918.)

No. 8.

1. SALES ☞199—TITLE—TRANSFER.

Transfer of title depends upon the intention of the parties, however indicated, and where there is no manifestation of intention, except what arises from the terms of the sale, the presumption is that, if the thing to be sold is specified, and is ready for immediate delivery, the contract is an actual sale, unless there is something to indicate a different intention.

2. BANKRUPTCY ☞212—RECLAMATION PROCEEDINGS—WHAT LAW GOVERNS.

Where the rights of the trustee and the petitioner in a reclamation proceeding depended upon whether title passed under a sale, the bankruptcy court will follow the law of the state where the contract was made and was to be performed.

3. SALES ☞43(1)—FRAUD.

Fraud and deceit upon the part of the buyer, operating to induce the sale, is sufficient to authorize the seller to rescind the sale.

4. SALES ☞44—FRAUD—INTENT NOT TO PAY.

A purchase of goods, with a preconceived intent not to pay for them, is such fraud as enables the seller to repudiate the sale.

5. SALES ☞219(4)—RESCISSION—EFFECT.

A seller, upon exercising his right to rescind on account of the fraud of the buyer, may recover the goods in specie, or their value and proceeds.

6. BANKRUPTCY ☞140(2)—CREDITORS—CLAIMS OF.

Where the bankrupt, without any intention to pay for goods, but promising to pay cash, obtained possession, and in violation of his agreement disposed of them, and placed the proceeds in a fund which came into the possession of the trustee, the seller, being entitled to rescind the sale, may recover the proceeds.

7. BANKRUPTCY ☞212—RECLAMATION PROCEEDINGS—PETITION.

A petition in reclamation proceedings by a seller, who rescinded a sale for the bankrupt's fraud, etc., and sought to recover the proceeds, which had been traced to the hands of the trustee, held sufficient.

8. BANKRUPTCY ☞140(2)—RECLAMATION PROCEEDINGS—SALES.

A seller held entitled to recover the proceeds of its goods, which it sold to the bankrupts, and which had been traced into the hands of the trustee, notwithstanding the manager of the bankrupts negotiated the sale, which the seller rescinded for fraud, and at one time had possession of the proceeds in his own safety deposit box.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. SALES ⟞201(4)—"C. O. D."—WHAT ARE.

A shipment C. O. D. means that the goods are to be delivered by the carrier upon payment to it of the charges due to the seller for the price, and those due to the carrier for its carriage, and a mere agreement that payment should be made before goods were delivered is not a C. O. D. sale.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, C. O. D.]

10. SALES ⟞219(4)—C. O. D. SALES—RESCISSION.

Though a sale be considered a C. O. D. sale, the seller may reclaim the goods or proceeds, if the sale was brought about through fraud.

Petition for Revision of an Order of the District Court of the United States for the Southern District of New York.

In the matter of Max Liebig and Cecelia Kochman, individually and as copartners doing business as Kochman & Co., bankrupts. Petition of Myle J. Holley, as trustee, to revise an order of the District Court in favor of petitioner in a reclamation proceeding. Petition to revise denied, and order affirmed.

This cause comes here from the United States District Court for the Southern District of New York on petition to revise an order made by that court on February 8, 1918. The facts appear in the opinion.

Archibald Palmer, of New York City (Maurice S. Hyman, of New York City, of counsel), for trustee.

Dallas Flannagan, of New York City, for claimant.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. This is a reclamation proceeding. The bankrupts were engaged in the city of New York in the business of buying and selling eggs. The petitioner was engaged in the same business and in the same city.

The bankrupts, through one Bernard Kochman, agreed on April 16, 1917, with one O'Shinsky, a salesman in the employment of the petitioner, to buy from the latter a carload of storage packed eggs then in transit, for which the bankrupts were to pay at the rate of 36½ cents a dozen. It does not seem to have been known at that time exactly how many dozen eggs the car contained. Bernard Kochman is the brother-in-law of Max Liebig, of the firm of Kochman & Co., bankrupts, and a son of Cornelia Kochman, the other member of the firm. He represented the firm throughout the whole of the transaction complained of.

As the bankrupts were already indebted to the petitioner to the amount of $900 on a credit which was not to exceed $1,200, it was agreed that the sale was to be a cash transaction, and that on the arrival of the car the seller was to notify the buyer before making delivery.

The carload of eggs arrived on April 19th, and the manager of the petitioner's business called Bernard Kochman on the telephone and informed him of its arrival, and that it was on the tracks of the Mer-

chants' Refrigerating Company at Jersey City, and that it contained, besides storage packed eggs, some undergrades, known as strains, checks, and current receipts. Kochman said that he would buy the under grades, too, and wanted the eggs delivered. He was again informed that payment was expected on delivery. Kochman replied that he understood the terms of sale and wanted delivery made. Thereupon petitioner telephoned the Merchants' Refrigerating Company to deliver the eggs at the petitioner's store, and they were brought there that afternoon on trucks. It was then ascertained that the car had checked 10 cases short, and that no record had been taken of the various commodities to ascertain what items were short, which was unfortunate, as the prices were different on each item.

Thereupon Kochman was again called on the telephone, the situation was explained, and Kochman said it would be all right to send the eggs around to his store, where they could be unloaded and the quantities ascertained, and the petitioner's representative could call for the money. The trucks were sent around to Kochman's store, and the eggs were unloaded, and the quantities ascertained. Thereupon Kochman telephoned the quantities to the petitioner, and its salesman, O'Shinsky, immediately went to the Kochman store and demanded the money. He was informed by Kochman that he (Kochman) was very sorry, but that he had been disappointed in not getting in several large checks that afternoon, and that, while he knew he had agreed to pay cash, he would have to be given a day or two. Kochman was reminded that this was not in line with the agreement, and that the petitioner would not do any business in that way. A considerable discussion followed, and Kochman was taken by O'Shinsky to the petitioner's store to talk things over with those in authority. On his arrival there Kochman was again told that petitioner wanted the money or the eggs and that the trucks would be sent up for the eggs. Kochman then said he did not think that ought to be done, that Kochman & Co. was a good big concern, and that everything would be all right; that it would not be a very nice thing to have the eggs taken out of his store after having them delivered; that it would look bad in the eyes of the other creditors to see a load of eggs go in and be taken out by the same concern; it would hurt his credit, and he said that he would pay for the eggs in a day or so.

Quite an argument followed and Kochman was told that his promise to pay in a day or two was not at all satisfactory, but inasmuch as the eggs were already in Kochman's store they might be left there under one consideration, and that was that he was not to touch those eggs, or move them, or sell them to anybody, and that the goods were to remain the property of George F. Hinrichs, Incorporated, until they were paid for. Kochman told him that this was perfectly agreeable to him. Kochman was asked when payment would be made and said that he might pay for them the next day or the day after, depending on when he got in the big checks he was expecting, and that at any rate he would pay for them not later than April 25th. Kochman was asked to sign an agreement to that effect, but no agreement was signed; Kochman saying:

"Now, here, Mr. Boerum, we are doing business with you right along, and we expect to do business with you right along. We have got a good little concern. I personally made a statement to Bradstreet's where I showed I was worth $29,000 in last November, and we have made money since, and there is no reason for acting in this way. If you cannot take our words for anything, we may as well stop doing business. Everything will be all right."

On April 25th payment had not been made, and has never been made. On April 21st Kochman sold 100 cases of the eggs to the National Biscuit Company for $982.50. On April 25th he sold to the same company 13 other cases for $127.72. These two invoices aggregated $1,110.22, and were paid for in a check, covering those invoices and others, which check was deposited in the Fidelity Trust Company on April 26th. On April 23d Kochman sold 80 cases of the eggs to Honigsberg & Co. for $855.60, receiving therefor a check for that amount, which he deposited the next day in the Fidelity Trust Company. On April 25th Kochman sold 150 cases of the eggs to W. F. Hofstatter, for which Kochman received a check for $1,575. This check Kochman cashed and placed the money in a safe deposit box in the Harriman National Bank, which box Kochman kept under the name of Louis Harris.

All of these sales were, of course, made by Kochman in violation of the agreement under which the eggs were allowed to remain in his possession. Kochman's testimony shows that, in addition to the deposit in his safe deposit box in the Harriman National Bank of the $1,575 above noted, he also deposited in that box cash aggregating in addition $7,487.50, which he drew out of the Fidelity Trust Company between April 24th and April 27th. On April 25, 1917, the firm's balance in the Fidelity Trust Company amounted to $3,684.31. On April 26th its balance was $4,399.36. On April 27th it was $3,281.49. On April 28th it was only $33.49. On April 27th $3,237.50 had been drawn out and put in the safe deposit box. On April 26th $2,750 had been drawn out and similarly disposed of. So on April 25th a like disposition was made of $1,000, and on April 24th of $500.

The contents in the safe deposit box were taken possession of by the receiver in bankruptcy, and were in his possession when the motion was made by the respondent herein for an order requiring him to turn over to the respondent $3,540.92 of the moneys so received, as being a trust fund derived from the proceeds of the eggs, which the bankrupts wrongfully converted. The referee in bankruptcy recommended that the prayer of the respondent be granted. The District Judge confirmed the report, and has entered an order directing that the petitioner recover of the trustee in bankruptcy the sum of $3,540.-82, with interest thereon from May 10, 1917; that being the date when the return thereof was demanded by the respondent. The petition to revise is from this order.

The trustee claims that the title to the eggs sold to Kochman & Co. passed from the seller and that the latter's rights are those of a general creditor. The respondent, who was the seller, insists that it never parted with its title, that the sale of the eggs by Kochman & Co. was made without right, and that the proceeds which Kochman & Co. received from the sale, having been traced into the hands of the

trustee in bankruptcy, were properly ordered to be paid to George F. Henrichs, Incorporated.

[1] In Roman law the title to the thing sold was not transferred until delivery and payment of the price. But if the sale was on credit the title to the thing sold passed when the property was delivered. Inst. 2, 1, 41; Dig. 19, 1, 11, § 2; Dig. 18, 1, frag. 19 and 53; Dig. 14, 4, 5, § 18. This rule of the Roman law we are informed is found in the modern law of Austria, Germany, and Spain, but is not now in the law of France and Italy. See Sherman's Roman Law in the Modern World, vol. 2, p. 344.

In England in early times the law required a delivery of the goods in order to pass the title. 15 Juridical Review, 391, 395. But after a time the principle was recognized that payment of the money was sufficient; and finally the rule became clearly established that the transfer of title depends upon the intention of the parties however indicated. Shepherd v. Harrison, L. R. 5 H. L. 116, 127; McEntire v. Crosslet [1895] A. C. 457, 463. And such is generally regarded to be the rule in the United States. In Hatch v. Oil Co., 100 U. S. 124, 25 L. Ed. 554, it is said to be the general rule that the agreement is just what the parties intended to make it, if the intent can be collected from the language employed, the subject-matter, and the attendant circumstances. And it is added that where there is no manifestation of intention, except what arises from the terms of the sale, the presumption is, if the thing to be sold is specified, and it is ready for immediate delivery, that the contract is an actual sale, unless there is something in the subject-matter or attendant circumstances to indicate a different intention. But every presumption of the kind must yield to proof of a contrary intent.

[2-5] The parties in this case agreed upon a sale for cash. In his work on Sales (1909 Ed., § 341) Professor Williston says that—

"Where a seller refuses to sell except for cash, it may mean that he refuses to part with the possession of the goods until the price is paid, but does not decline to transfer title, or it may mean that he declines to transfer title. Although a transaction of either sort might as an original question be appropriately termed a cash sale, in fact that name has generally been used for transactions of the latter sort only, and to avoid confusion its use should be so confined."

And he adds that cash sales are therefore not regarded as within the scope of the statutes requiring record of conditional sales, since the separation of titles which is characteristic of conditional sales is not contemplated in cash sales. And the same writer in section 343, discussing the true test of a cash sale, says:

"If the parties when they make their bargain contemplate an exchange of the goods for the price immediately on making the bargain, the sale is to be regarded as a cash sale. There is no occasion to invoke the doctrine of a sale subject to a lien. On the other hand, if the parties do not contemplate an immediate exchange of the money for the goods, even though they do contemplate that possession of the goods shall not be delivered until the price is paid, it is presumptively an absolute sale as soon as the parties are agreed on the terms of the bargain and the goods are in a deliverable state in accordance with the rules previously given. In case of doubt it seems better to assume that the latter kind of bargain was intended."

If the doctrine thus stated is sound, then it follows that under a contract such as the parties made, assuming that it was not induced by fraud or otherwise invalid, title to the property passed to the buyer when the bargain was concluded, with a lien in the seller to retain possession until payment was made.

But the courts have held in a long line of decisions that in sales for cash title does not pass to the buyer until the price is paid or payment is waived. Hirsch v. Leatherbee Lumber Co., 69 N. J. Law, 509, 55 Atl. 645; Adams v. O'Connor, 100 Mass. 515, 518, 1 Am. Rep. 137; Ballantyne v. Appleton, 82 Me. 570, 20 Atl. 235; Sanborn v. Shipherd, 59 Minn. 144, 60 N. W. 1089; Burditt Bros. v. Howe, 69 Vt. 563, 38 Atl. 240; People's State Bank v. Brown, 80 Kan. 522, 103 Pac. 102, 23 L. R. A. (N. S.) 824; City of South Bend v. Martin, 142 Ind. 53, 41 N. E. 315, 29 L. R. A. 531; Wheeler & Wilson Mfg. Co. v. Irish & American Dime Savings Co., 105 Ga. 57, 31 S. E. 48; Drake v. Scott, 136 Ala. 261, 33 South. 873, 96 Am. St. Rep. 25; Hilmer v. Hills, 138 Cal. 134, 70 Pac. 1080; Coleman v. Reynolds, 207 Mo. 477, 105 S. W. 1070. It is not necessary that we should now inquire which of these two theories is supported by the better reason, for both theories assume that the sale agreement was valid. And we do not need to inquire, under the circumstances of this case, which one of those theories has been adopted by the courts of the state of New York, or whether the law of that state has been changed by its substantial adoption in 1911 of the Sales Act (Personal Property Law [Laws 1911, c. 571; Consol. Laws, c. 41] §§ 82-158), as recommended by the Commissioners on Uniform Laws.

If it were necessary to the decision of this case to determine the question whether title passed or did not pass, this court unhesitatingly would decide that question according to the New York law as the contract was made in New York and was to be performed in New York. But it is the law of New York, as it is of all the other states, that fraud and deceit upon the part of the buyer, operating to induce the sale, is sufficient to authorize a seller to rescind the sale. Bliss v. Sickles, 142 N. Y. 647, 36 N. E. 1064. And a purchase of goods with a preconceived intent not to pay for them is such fraud as enables the seller to repudiate the sale. Hennequin v. Naylor, 24 N. Y. 139. And the seller, upon exercising his right to rescind, may recover the goods in specie or their value or proceeds. Beloit Bank v. Beale, 34 N. Y. 473.

[6, 7] If the bankrupts obtained possession of the eggs by fraud, misrepresentation, and deceit, and then fraudulently and wrongfully sold them, and afterwards collected part of the proceeds of the sale, which have been traced into the hands of the trustee in bankruptcy, there is no doubt but that the respondent is entitled to the order which the District Judge has entered. The claim that the allegations of the petition are inadequate for the relief sought is without merit.[1]

[1] "That heretofore, and on or about the 16th day of April, 1917, the said bankrupts, by fraud, misrepresentation and deceit, obtained from your petitioner the physical possession of certain eggs (about one carload), the property of your petitioner. Thereafter, while the property and title to said carload of eggs remained in your petitioner, the bankrupts, by and through the larceny of their managing agent and representative, Bernard Kochman, fraudu-

[8] So the claim that the respondent is not entitled to the proceeds of a wrongful sale traced into the hands of the trustee in bankruptcy of the firm of Kochman & Co., because Bernard Kochman, who bought the eggs for Kochman & Co., obtaining them by fraud, and who sold them contrary to his agreement, and who deposited the proceeds at first in the firm account, and then checked them out and hid the proceeds in his safe deposit box, was not a member of the firm of Kochman & Co., but simply the manager thereof, seems to us devoid of all merit. The evidence shows that at the time Kochman bought these eggs he was converting the assets of the firm into cash, and accumulating and concealing the money so obtained in a safe deposit box under an assumed name, and was contracting for the sale of eggs at a less price than that for which he was purchasing them. The referee has found that at the time the bargain was made the buyer had no intention to pay for the eggs, and all the time was fraudulently planning to obtain possession of the vendor's eggs, in order to dispose of them and hide the proceeds. The only inference to be drawn from the facts is that Kochman never had any intention of paying for the eggs, and that all his representations as to a payment were false, and made with intent to defraud. The law is too well settled to need any citation of authorities that under such conditions the seller is entitled to reclaim the goods if in possession of the buyer, and if he has disposed of them then he may have the proceeds if he can trace them.

[9, 10] The referee in his report found that the bargain "was one for cash on delivery in the ordinary course of business at or about the time of delivery." And the trustee in his argument in this court asserts that this was a finding that the transaction was a "C. O. D." sale. It was, of course, nothing of the sort. A shipment "C. O. D." means that goods are to be delivered by the carrier upon payment to it of the charges due to the seller for the price and those due the carrier for its carriage of the goods. State v. Peters, 91 Me. 31, 39 Atl. 342; State v. Mullin, 78 Ohio St. 358, 85 N. E. 556, 18 L. R. A. (N. S.) 606, 125 Am. St. Rep. 710. In the case at bar there was no agreement of this nature. Those in charge of the trucks had no instructions to collect at the time of delivery either the price of the eggs or their own charges. And if it had been a "C. O. D." sale, and if in such a sale title passes, it would still be true that the seller might reclaim the goods or the proceeds if the sale was brought about by fraud.

It is apparently conceded by counsel that the sum directed to be paid by the trustee to the respondent came from the sale of the eggs, and that question does not need to be considered. We may say, however, that no error was committed in this respect.

The petition to revise is denied, and the order of the District Court is affirmed.

lently and wrongfully sold said eggs of your petitioner and collected part of the proceeds therefor, amounting to the sum of $3,540.82. That thereafter the said receiver was appointed, and the said bankrupts have now turned over the said sum to said receiver, who is now in possession thereof. That demand for said sum upon said receiver has been duly made by your petitioner, but he wrongfully refuses to turn over the same to your petitioner."