BORMAN et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 20, 1919.)

No. 35.

1. SALES ☞4(3)—"BAILMENT" DISTINGUISHED FROM "SALE."

Where articles are delivered by one person to another, who is to perform labor on them or to manufacture them into other articles for the former, the transaction is a "bailment"; but if the person who receives the articles may deliver in return articles which are not the product of those received, the transaction is in fact a "sale."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bailment; Sale.]

2. CONSPIRACY ☞33—TITLE TO LININGS FURNISHED BY UNITED STATES TO MANUFACTURING CONTRACTOR DOES NOT PASS.

Under a contract between the United States and one of the defendants for the manufacture of leather jerkins, which required the United States to furnish the linings, held, that title did not pass, so that the contractor and a confederate, who conspired to obtain linings from the United States in excess of needs and sell the same, etc., were guilty of violating Criminal Code, §§ 36, 37 (Comp. St. §§ 10200, 10201).

3. CRIMINAL LAW ☞1178—ERROR WAIVED WHERE NOT MENTIONED IN RECORD OR BRIEF.

In a prosecution against a contractor, who manufactured leather jerkins for the United States, and another, for conspiracy to defraud the United States, etc., in violation of Criminal Code, §§ 36, 37 (Comp. St. §§ 10200, 10201), where it appeared that the contractor disposed of linings furnished by the United States, title to which did not pass to him, it was unnecessary to inquire whether, at the time he demanded the linings, disposed of, he knew that they were in excess of his requirements, where there was no evidence in the record, and nothing was said in the argument concerning it.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Jacob A. Borman and another were convicted under Criminal Code, §§ 36, 37, of conspiring to apply to their own use property of the United States, and of conspiring to sell, convey, and dispose of such property, and they bring error. Affirmed.

Wood, Molloy & France, of New York City (Henry P. Molloy and Melville J. France, both of New York City, on the brief), for plaintiffs in error.

Francis G. Caffey, U. S. Atty., of New York City (Robert A. Peattie, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The plaintiffs in error (hereinafter called defendants) have been convicted upon an indictment which in the first count charged them with having unlawfully conspired to apply to their own use certain property of the United States, and in the second count charged that they unlawfully conspired to sell, convey, and dispose of the same property. The indictment is based on the following provisions of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. §§ 10200, 10201]):

"Sec. 36. Whoever shall steal, embezzle, or knowingly apply to his own use, or unlawfully sell, convey, or dispose of, any ordnance, arms, ammunition, clothing, subsistence, stores, money, or other property of the United States, furnished or to be used for the military or naval service, shall be punished as prescribed in the preceding section.

"Sec. 37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

The testimony shows, and defendants admit, that defendant Borman caused to be shipped to defendant Phillips about February 25, 1918, some 2,664 yards of linings which Phillips received and which had been furnished by the government to the defendant Borman to be used in making up leather jerkins under contracts which will be more fully referred to—which jerkins were intended to be used by the military forces of the United States. The 2,664 yards of linings were delivered at various times on the demand of Borman made upon the Quartermaster's Department to be used under the contracts, and which were in excess of the amount of linings it was necessary for the government to furnish. It appears that defendant Phillips, acting under Borman's direction, sold this extra lining material for the sum of about $6,000, checks for which were delivered to Borman, who in turn indorsed them over to an employé, who, at the direction of Borman, deposited the check to his (the employé's) credit in his bank. The money was afterwards applied to the use of the defendants. And the defense relied upon is that at the time the defendants appropriated these linings to their own use the title was not in the United States.

It appears that two contracts were made between the United States and the Borman Sheep Lined Coat Company, one on September 27, 1917, and the other on October 20, 1917. Contract No. 1112 calls for the manufacture of 63,000 leather jerkins, and is on a blank printed in part and typewritten in part. It has printed on it that it is "to be used for all purchases of supplies, clothing, wagons, harness, bacon, etc., which are purchased in bulk or large quantities to be delivered at depots or to purchasing quartermasters." It contains a typewritten statement that the supplies are "to be manufactured from materials furnished in part by the Quartermaster Corps, and to be delivered at the depot of the Quartermaster Corps, U. S. Army, Philadelphia, Pa." It states that "the government is to furnish lining, buttons, and rings only; contractor is to furnish all other materials"; also that "the materials furnished by the government are to be received by contractor f. o. b. New York, N. Y.; * * * contractor to be liable for any loss of or damage to any of the materials furnished by the Quartermaster Corps from any cause whatsoever while in his possession. All rags and clippings from the linings shall remain the property of the United States and be delivered with the finished jerkins."

Contract No. 1464 calls for the manufacture of 50,000 leather jerkins, and is on a blank also printed in part and typewritten in part. Like the first contract it states that it is to be used for all purchases of supplies, etc. It contains the following provision:

"The government is to furnish the lining and buttons only. Contractor to furnish all other materials. The lining and buttons to be received by contractor f. o. b. New York. All rags and clippings from linings furnished by the government delivered at the Philadelphia depot of the Quartermaster Corps, U. S. Army, without expense to the United States for packing or transportation; contractor to be liable for any loss of or damage to any materials furnished by the Q. M. Corps, U. S. Army, from any cause whatsoever while in contractor's possession."

Both contracts specify the amount to be paid for each jerkin and then provide as follows:

"That for and in consideration of the faithful performance of the stipulations of this contract, the contractor shall be paid, at the office of the contracting officer, or by a disbursing officer designated by him to make payments, the prices stipulated in this contract for those supplies delivered and accepted; and, except as otherwise provided, payments will be made as soon after the acceptance of each delivery as is practicable and funds on hand for the purpose will admit."

Both contracts provide:

"That the articles herein contracted for shall be examined and inspected, without unnecessary delay after being delivered, by a person or persons appointed by the United States; and upon such inspection, the articles found to be in all respects as required by this contract shall be received and become the property of the United States. Any and all articles that may, upon such inspection, be condemned or rejected, shall be removed from the premises by the contractor within 10 days after the said contractor or his agent shall have been notified of such rejection; otherwise, at the risk and expense of the contractor."

Counsel for the defendants argue that the contracts show that the transactions involved a sale of the materials which the government

furnished, as the word "purchases" and "purchased" necessarily imply a sale; so that at the time of the delivery of the linings to the contractor the title passed out of the United States and to the contractor, the amount finally to be paid by the government for the finished jerkins being reduced by the amount due to the government for the linings furnished.

[1, 2] It is elementary that where articles are delivered by one person to another, who is to perform labor upon them or to manufacture them into other articles for the former, the transaction is a bailment; but if the person who receives the articles may deliver in return articles which are not the product of those received, the transaction is in effect a sale. Now it is not necessary to inquire, for reasons which will presently appear, whether under the provisions of the contracts herein involved the delivery of these linings involved a bailment or a sale, whether the contractor was bound to use the linings which the government delivered, or whether other linings might have been used in their stead. Neither is it conclusive that the blanks used in filling in the terms of the contracts contained the words "to be used for all purchases of supplies." The government was undoubtedly purchasing supplies, and they were to be manufactured in part from materials furnished by it and in part from materials furnished by the contractor. But for the purpose of the argument we shall assume that under the contracts there was a sale of the linings, and not a bailment. Then the question arises whether or not under the sale the title had passed to the linings herein involved.

This court had under its consideration in Re Liebig, 255 Fed. 458, 166 C. C. A. 534, the question as to the time when title passes under a sale. We said in the case cited that in sales the transfer of title depends upon the intention of the parties however indicated. And in Hatch v. Oil Co., 100 U. S. 124, 25 L. Ed. 554, the general rule was said to be that the agreement as to the passing of title is just what the parties intended to make it, if the intent can be collected from the language employed, the subject-matter, and the attendant circumstances. We think the intent of the parties to these two contracts is clearly indicated in the language they employed.

The provision already referred to which provided that the contractor was to be liable to the United States for any loss of or damage to any of the materials furnished by it would seem to indicate that the title to the property continued in the government and had not passed to the contractor. If the title had passed out of the United States, the property was the property of the contractor, and there was no necessity for such a provision.

Moreover, it was provided, as we have seen, that "all rags and clippings from the linings 'shall remain' the property of the United States"; that is to say, the title in the rags and clippings must under this language have been all the time in the United States. If the title to the linings had passed out of the United States at the time of their delivery to the contractor, the title to so much of the linings as subsequently became rags and clippings originally passed along with the rest, and it could not properly have been said that as to

them the title should continue or "remain" in the United States. Some other language would have been necessary to indicate that the United States was to be reinvested with the title which it lost when the linings were delivered. Assuming, then, a sale, it is clear that the title could not have been intended to pass until the linings were cut out, and then only as to so much as were used in the jerkins.

In view of what has been said, it is not necessary to consider certain cases which have held that contracts in some particulars not unlike those in this case have held that the transaction amounted to a sale and not a bailment. Power Co. v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973; Hargraves Mills v. Gordon, 137 App. Div. 695, 122 N. Y. Supp. 245. Neither is it important to consider a class of cases of which Dixon v. London Small Arms Co., Ltd., 1 App. Cases, 632, is the most notable, in which the courts have considered whether such contracts result in a sale or in an agreement for service.

An important fact is that these linings were not obtained in accordance with any contract. The government was under no contractual obligation to furnish them. It was only contractually obliged to furnish the amount of linings necessary to enable the contractor to manufacture the number of jerkins contracted for. Another important fact is that the amount of the linings the government was to furnish was not furnished altogether, but as required and called for by the contractor. The Quartermaster's Department made an allotment to each contractor of the amount of the material he was entitled to receive under each contract, and material was issued from time to time as called for. When Borman in New York applied to the Quartermaster's Department for material the officials there called up the department in Philadelphia and said: "Mr. Borman is here for material; is it all right to give it to him?" So that Borman, using the contract as a reason for his demand, asked for his material in excess of what he was entitled to under his contract, and obtained the 2,664 yards of the linings which he sold. This yardage cannot be said to have been obtained in accordance with any contractual obligation.

Moreover, as it was never cut, but remained in the form in which it was received, no title passed, and it continued to be the property of the government. And the clandestine manner in which it was sold and the proceeds put in the name of Borman's employé indicates that Borman very well knew that it was not his property, and that he knew he was acting dishonestly in what he did. The court in his charge said:

"In other words, as reasonable men, pass upon this situation and all the evidence in the case, and determine whether or not these defendants acted as honest men or as dishonest men; and if you conclude that they acted dishonestly, whether their intent and purpose was knowingly to apply to their own use property of the United States, and whether their purpose was to unlawfully sell, convey, and dispose of property of the United States."

And it was also charged:

"That these defendants cannot be convicted in this case, unless the jury believe from the evidence to a moral certainty and beyond a reasonable doubt

that they conspired to apply the linings to their own use, or conspired to unlawfully dispose of them knowing that the linings belonged to the United States."

Under the charge, as given, Borman could not have been convicted if the jury believed that Borman honestly thought that he had obtained title to the 2,664 yards of linings which he sold. We must conclude, therefore, not only that the linings which he sold were as a matter of law the property of the United States, but that defendants did not believe that the title to the linings had passed from the government to Borman.

[3] Under the circumstances it is not important to inquire whether Borman, at the time he demanded the additional yards of linings, knew that they were in excess of the amount which he was entitled to receive under the contracts. There is no evidence upon that subject in the record, and nothing was said concerning it upon the argument in this court; and we must assume that Borman did not obtain possession by a trick or by fraud. If possession had been obtained by a trick and animo furandi, title, according to many cases, would not have passed. See Kerr on Fraud and Mistake, pp. 10, 11; Cole v. Northwestern Bank, L. R. 10 C. P. 354, 373; Whitehorn Brothers v. Davison, [1911] 1 K. B. 463, 470; Oppenheimer v. Frazer, [1907] 2 K. B. 50, 70; Kingsford v. Merry, 1 H. & N. 503; Regina v. Middleton, L. R. 2 C. C. 38; Bailey v. State, 58 Ala. 414; State v. Williamson, Houst. Cr. Cas. (Del.) 155; Cooper v. Commonwealth, 110 Ky. 123, 60 S. W. 938, 52 L. R. A. 136, 96 Am. St. Rep. 426; Wolfstein v. People, 6 Hun (N. Y.) 121; Goff v. Golt, 5 Sneed (Tenn.) 562.

The defendants are in this court, as they were in the court below, admitting that they obtained the linings wrongfully, that they sold them wrongfully, and that they appropriated to their own use wrongfully the moneys realized from their sale. They seek to escape upon a technicality the punishment which the Criminal Code of the United States imposes. In this they cannot succeed. The defense interposed is not tenable. The title to the 2,664 yards continued in the United States.

Judgment affirmed.

MANTON, Circuit Judge (dissenting). The defendants below were charged in the indictment with having conspired to commit an offense against the United States, by applying to their own use jerkin linings, the property of the United States. The prosecution proceeded upon an alleged violation of sections 36, 37, of the Criminal Code of the United States.

The defendant Borman was engaged in business under the name of Borman Sheep Lined Coat Company and had contracts with the government to furnish in all 113,000 leather jerkins. Under the terms of the contracts, the Quartermaster's Department delivered to Borman quantities of linings to be used in the making of jerkins. On the 25th of February, 1918, Borman caused to be shipped to the defendant Phillips 2,664 yards of such linings, which were delivered

to Borman pursuant to the contracts with the government. Phillips, acting under the instructions of Borman, sold the linings for $6,000, and the check therefor was delivered to Borman, who indorsed it over to an employé, and this was deposited to the employé's credit in his bank.

The main inquiry is whether the linings in question were the property of the United States at the time they were sold under Borman's instructions. The District Judge charged the jury, as a matter of law, that the title to the linings was in the United States at the time of their sale by the defendants, or at the time of the commission of the crime as charged. It is the contention of the defendants that the contracts were of manufacture and sale, and that the possession of the linings by them was not by mere bailment, with a contract of service. An examination of the language of the contracts will reveal that the transaction is referred to as a purchase and sale of the jerkins; the purchaser being the government. In order to make a valid sale of the jerkins to the government, it was necessary for the contractor to pass a good title, not only of the materials which he purchased and placed in the jerkins, but each and all of the materials which went to make up the manufactured product; otherwise the sale would amount to a portion of the jerkins—such of the materials as were purchased by the contractor and placed in the jerkins. The linings were delivered to the contractor in bulk, and the inquiry is whether title thereto passed and when it passed. The contracts provided in part as follows:

"Contract for supplies to be delivered in bulk at depots and the purchasing quartermaster for distribution or use in manufacture, etc. To be used for all purchases of supplies, clothing, wagons, harness, etc., which are purchased in bulk or large quantities to be delivered at depots or to purchasing quartermasters."

"Contract for army clothing (to be used exclusively for the manufacture of army clothing where raw material is furnished by the United States)."

It would appear that a purchase of jerkins was intended, and not a contract for service upon materials furnished by the government.

Another form of contract used by the government, which is in evidence, but is not the contract under which the lining was sold, reads in part:

"8. *Title to Material Furnished.*—Unless otherwise expressly provided herein, all materials paid for or furnished by the government under this contract, and all parts and pieces thereof and clippings therefrom, in whatsoever form or process of manufacture, shall be and remain the property of the government, and, while in the contractor's possession, shall be suitably marked as such by the contractor, in the manner directed by the contracting officer, so as to be identified as the property of the government."

This, it will be observed, indicates a manufacturing service. The word "purchase" is not used, and the tenor of the provisions is that the contractor is to return to the government, in manufactured form, the materials which it furnished.

Purchase implies a substitution of one owner for another. The word "purchase," as used in the title of the contracts, must be considered in its usual and ordinary meaning, for the contracts are ex-

clusively concerned with the buying of supplies by the governn ent, and the word "supplies" indicates a contract of purch se, and not one of service.

Section 3 of the contracts provides:

"3. That the articles herein contracted for shall be examined and inspected, without unnecessary delay in being delivered, by a person or persons appointed by the United States; and upon such inspection the articles found to be in all respects as required by this contract shall be received and become the property of the United States. Any and all articles that may, upon such inspection, be condemned or rejected, shall be removed from the premises by the contractor within ten days after the said contractor or his agent shall have been notified of such objection; otherwise, at the risk and expense of the contractor."

If the goods on inspection are rejected, they do not become or remain the property of the United States, but remain the property of the contractor, who is obliged to remove the same at his own expense. Nothing in the contracts requires the contractor to part the rejected jerkins and, while keeping for himself the portion supplied by him, return to the government the linings supplied by it. On the contrary, the contractor in such a case would be required to furnish in place of the rejected jerkins, completed ones complying with the terms of the contract, and when he has done so, he would be free to dispose of the rejected jerkins for his own benefit. It will be noted that the other contract referred to (not involved here) provided that all materials throughout the entire process of manufacture, remain the property of the United States; but it is further provided that, in case of rejected goods, "the government shall be paid by the contractor a sum equal to the actual cost or market value at the time of such rejection of all materials furnished hereunder by the government for the making of such articles."

The specifications provide the kind of materials used for linings. These were what the government was to furnish to the manufacturer, and the government was necessarily to get its own linings back. If they have always remained its own, it would not insist that the linings be of a certain kind. A buyer of leather jerkins would so insist. The contracts refer to the price paid, and that indicates the sum which the seller will receive in exchange for his completed product. The contracts further provide that, in case of the failure of the contractor to perform any part of the contracts, the government shall have the right to supply the deficiency by procurement in the open market, or otherwise purchase any of the supplies so required, at such places as it may elect. This is to be done at the expense of the contractor. It is the usual provision of the contract expressing the legal right of any buyer in a contract of bargain and sale to buy in the open market an article similar to that to which the seller has agreed to deliver to him, and to charge the seller the excess in price over the price contracted for, where breach of contract results.

If it were a mere contract of service, another rule of damages would apply involving the cost to get the work done by another. The idea of the contract, that only upon acceptance shall the jerkins become the property of the government, was intended to mean that then only

would the title pass to the government. This imposed upon the manufacturer the entire responsibility for the goods, the process of manufacturing, and the result of such process. Under the terms, the contractor became liable for any loss of or damage to the materials furnished by the government, and the government inspector might inspect the goods and reject any of the articles or materials because of inferior workmanship. In the case of such rejection, the materials necessarily were thrown back upon the contractor, and it became the duty of the contractor to produce, at his cost, other materials to take the place of the rejected, and make satisfactory jerkins. It is clear to me that there was a sale of the linings in question, and not a bailment thereof. Power Co. v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973; Hargraves Mills v. Gordon, 137 App. Div. 695, 122 N. Y. Supp. 245.

Since it appears that the contracting parties by their written contracts intended a contract of manufacture and sale of the jerkins, title to the parts of the constituent parts of said completed product were the subject of a sale. In Buffum v. Merry, 4 Fed. Cas. No. 2112, Judge Story said:

"It was not a contract whereby the specific yarn was to be manufactured into cloth wholly for the plaintiff's account and at his expense, and nothing but his yarn was to be used for the purpose. There the property in the yarn might not be changed; but here the cloth was to be made of other yarn as well as the plaintiff's, the warp of the plaintiff's yarn, the filling of the defendant's. The whole cloth, when made, was not to be delivered to the plaintiff, but so much only as at 15 cents per yard would pay for the plaintiff's yarn at 65 cents per pound. What is this but the sale of the yarn at a specified price, to be paid for in plaids at a specified price."

In Dixon v. London Small Arms Co., Ltd., 1 App. Cases, 632, a somewhat similar case, Lord Chancellor Cairns said:

"Now, * * * in order to answer that question you must turn to the contract itself. * * * Therefore * * * in substance the result of the whole is this: What I may call the raw material for the barrel, the steel tube, is supplied by the government at a certain price; the butt or stock of the rifle is supplied by the government at a certain price; all the other component parts of the arm have to be provided or made (for the contract is consistent with either view) by the contractors. The whole component parts have to be inspected from time to time by the officers of the government. They have the right from time to time to reject any part of the arm while in the course of manufacture, which is not consistent with the contract and the specification; and when the whole is, to use the technical term, 'assembled,' when all the pieces of the arm are put together, then if it complied with the specification, and in that case only, it is to be taken over and accepted by the government, and the property in it is to pass to the government, and, on the other hand, the price is to be paid for the article to the contractors. * * * The question then has to be asked: During this process, what is the position of the person who is called the contractor? He is clearly not a servant of the crown. That was not contended. There is no contract of service whatever between him and the crown. He is not an officer of the crown, engaged in the service of the crown. Is he, then, an agent of the crown? * * * I cannot find any ground whatever for contending that the contractor is an agent of the crown. He is a person who is a tradesman, and not the less a tradesman because he is engaged in works of a very large and extensive character; he is a tradesman manufacturing certain goods, for the purpose of supplying them according to a certain standard, which is laid before him as a condition on which the goods will be accepted. During the time of the manufacture the property, at all events, in that which concerns the present case, namely,

the property in the lock, or the breech action of the rifle, is not the property of the crown. The materials are not the materials of the crown. If the respondents make the lock themselves, the materials are provided by the respondents, and the respondent's work upon those materials, not as the agents of the crown, but as conducting their own work and their own manufacture for the purpose of supplying the complete arm. * * * I can find here no delegation of authority—no mandate from a principal to an agent; I find here simply the ordinary case of a person who has undertaken to supply manufactured goods, who has not got the goods ready manufactured to be supplied, and who has to make and produce the goods in order to execute the order which he has received. I find him engaged in that work on his own account up to the time when the article is completed and handed over to, and accepted by, the person who has given the order. I therefore arrive at the conclusion that there is not here on the part of the respondents that which amounts in any way to the character or the status of an agent, a servant, or an officer of the crown."

Lord O'Hagan said:

"The contract was not of service, but of sale, for the contractors' own benefit, of certain commodities, fulfilling certain conditions and to be paid for on certain terms; and if those conditions were fulfilled, whether by their own workmanship or articles provided at their instance, I apprehend the crown could not have rejected the commodities; as, on the other hand, its rights of rejection on nonfulfillment until the moment of delivery remained intact, a state of things difficult to be reconciled with the theory of agency or service."

In effect, the delivery of the linings in question was in part payment of the cost or price of the finished product. The parties evidently intended this. The price paid to the contractor was reduced to the extent of the value of the linings. The question of title must necessarily turn upon the intention of the contract and the intent of the parties as therein made plain.

But it is said that because of the provision, "All rags and clippings from the lining shall remain the property of the United States and be delivered with the finished jerkins," a clear indication is given by the parties that title to the linings vested in the government at all times. But, to me, the requirement for such a provision indicates that the parties intended just the reverse. If the lining material did not vest in the contractor on the delivery to him by reason of the nature and effect of the contract itself, the clause would be entirely unnecessary and without meaning, because, in such case, they would be reserved to the government by the very force of its title, without the necessity of such a clause or reservation. On the other hand, if the title to the lining material did become the property of the contractor on delivery to him, then such a reservation has both meaning and effect, and constitutes an exception to the general grant of the linings. When the government indicated a wish to accept such linings in the contract offered in evidence (Defendants' Exhibit D, Contract 108— not involved here) it said:

"All unused material furnished by the government shall remain the property of the United States, be properly prepared for shipment and held for such disposition as may be necessary by the government. All rags and clippings from material furnished by the government shall remain the property of the United States."

From the foregoing, it is apparent that the government, when intending to reserve ownership in property which it furnishes to the

contractor, can and does plainly express its intent therefor. The language of the contract, since it is drawn by the government, must be presumed to be that of the government. It is the general rule that exceptions and restrictions are to be construed strictly against the writer of the contract, and not to be extended beyond a fair import of the language expressed, except by necessary implication. Duryea v. Mayor, 62 N. Y. 592. It was well said in Mallory v. Willis, 4 N. Y. 76:

"Whatever the motive was, the express provision requiring Willis to return the offals and a specific quantity and quality of flour for a given quantity of good merchantable wheat, taken in connection with the other provisions of the contract, implies the exclusion of any claim or right of the plaintiffs to any greater quantity of flour, whatever the quantity produced was, and I think it is fairly implied that the surplus, if any, was to belong to Willis."

In Clarkson v. Stevens, 106 U. S. 505, 1 Sup. Ct. 200, 27 L. Ed. 139, Stevens had been under a contract to build a ship for the United States. Materials for the ship were delivered at Stevens' dock and under contract, were there received by the United States official, and stamped "U. S.," and "became the property of the United States." It was claimed that the contract provision made the ship built from these materials also the property of the United States as it was built. It was held that title to the unfinished vessel remained in Stevens, and that no property therein vested in the United States. The court said:

"For the inference is obvious, from the particularity of such a provision, that the larger interest would not be left to mere intendment."

I am of the opinion that title to the linings passed when delivered to the contractor and that the transaction as to the linings was a sale thereof and not a mere bailment. It was therefore error for the court to charge, as a matter of law, that the title remained in the government. Exception was taken to this charge, and, in my opinion, presents error which requires reversal from this judgment.